PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————

Nos. 08-8033 & 08-8045

—————

IN RE: DVI, INC. SECURITIES LITIGATION

Deloitte & Touche,
Petitioner at No. 08-8033

Kenneth Grossman; Cedar Street Fund;
Cedar Street Offshore Fund,
Petitioners at No. 08-8045

—————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Civil Action No. 03-cv-5336
(Honorable Legrome D. Davis)

—————

Argued April 20, 2010

Before: SCIRICA and AMBRO, *Circuit Judges,*
and JONES[*], *District Judge.*

(Filed: March 29, 2011)

DAVID L. COMERFORD, ESQUIRE (ARGUED)
JEFFREY A. DAILEY, ESQUIRE
Akin Gump Strauss Hauer & Feld LLP
2001 Market Street
Two Commerce Square, Suite 4100
Philadelphia, Pennsylvania 19103

L. RACHEL HELYAR, ESQUIRE
JESSICA M. WEISEL, ESQUIRE
Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067
    Attorneys for Petitioner/Cross-Respondent,
    Deloitte & Touche LLP

CLINTON A. KRISLOV, ESQUIRE (ARGUED)
MICHAEL R. KARNUTH, ESQUIRE (ARGUED)
ROBERT P. DEWITTE, ESQUIRE
Krislov & Associates, Ltd.

---

[*]The Honorable John E. Jones, III, United States District Judge for the Middle District of Pennsylvania, sitting by designation.

20 North Wacker Drive, Suite 1350
Chicago, Illinois 60606

STEVEN A. SCHWARTZ, ESQUIRE
KIMBERLY M. DONALDSON, ESQUIRE
Chimicles & Tikellis LLP
One Haverford Centre
361 West Lancaster Avenue
Haverford, Pennsylvania 19041
  Attorneys for Respondents/Cross-Petitioners,
  Kenneth Grossman; Cedar Street Fund;
  Cedar Street Offshore Fund

CELIA G. BARENHOLTZ, ESQUIRE (ARGUED)
Cooley LLP
1114 Avenue of the Americas, 47th Floor
New York, New York 10036

JOHN G. HARKINS, JR., ESQUIRE
MARIANNE CONSENTINO, ESQUIRE
Harkins Cunningham LLP
2800 One Commerce Square
2005 Market Street
Philadelphia, Pennsylvania 19103
  Attorneys for Respondents,
  Clifford Chance LLP and Clifford Chance US LLP

OPINION OF THE COURT

SCIRICA, *Circuit Judge*.

Investors in Diagnostic Ventures, Inc., brought this class action against multiple parties, alleging violations of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. These interlocutory appeals under Fed. R. Civ. P. 23(f) present issues at the intersection of class action procedure and the securities laws. The District Court granted plaintiffs' motion for class certification with respect to all defendants but one. Parties from both sides filed cross-appeals. We will affirm.

**I.**

Diagnostic Ventures, Inc., (DVI) was a healthcare finance company that extended loans to medical providers to facilitate the purchase of diagnostic medical equipment and leasehold improvements, and offered lines of credit for working capital secured by healthcare receivables. Founded in 1986, DVI was a publicly traded company with reported assets of $1.7 billion in 2003. Its common stock began trading on the New York Stock Exchange (NYSE) in 1992. It issued two tranches of 9 7/8% senior notes: the first, issued in 1997, totaled $100 million; the second, issued in 1998, totaled $55 million. The

4

Notes were similar,[1] but the 1997 Notes were traded on the NYSE, while the 1998 Notes were traded over the counter.

On August 13, 2003, DVI announced it would file for Chapter 11 bankruptcy protection resulting from the public disclosure of alleged misrepresentations or omissions as to the amount and nature of collateral pledged to lenders. In the ensuing years, its common stock and 1997 Notes were de-listed from the NYSE, the Securities and Exchange Commission and Department of Justice undertook investigations, its former Chief Financial Officer, Steven Garfinkel, pleaded guilty to fraud, the bankruptcy trustee and multiple lenders filed lawsuits, and the company dissolved.

On September 23, 2003, Cedar Street Fund, Cedar Street Offshore Fund, and Kenneth Grossman[2] filed a class action

---

[1]The extent of the Notes' similarities is disputed by the parties. *See infra* n.15.

[2]Cedar Street Fund is a limited partnership that invests in small- and mid-cap stocks. Cedar Street Offshore Fund is a Cayman Islands tax-exempt company that invests in the same manner as Cedar Street Fund. According to the funds' promotional materials, the minimum investment is $1 million. Grossman was a managing member of and 50% shareholder in Cedar Street Fund's General Partner, SG Capital Management, LLC, and a director of the offshore fund. Plaintiffs' investment strategies and their relationship with DVI insiders are disputed,

5

lawsuit alleging violations of federal securities laws.[3]  In their Fifth Amended Complaint, plaintiffs assert claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's Rule 10b-5, 17 C.F.R. § 240.10b-5, against multiple defendants, of which only Deloitte & Touche LLP and Clifford Chance LLP are involved in these appeals.[4]  Deloitte was DVI's certified public accountant from 1987 to June 2003.  Clifford

---

and we discuss them in greater detail in Part II.B., *infra*.

[3]The District Court appointed the three investors as lead plaintiffs and consolidated various similar cases.

[4]Other parties against whom plaintiffs allege a § 10(b) claim in the Fifth Amended Complaint include: (1) officers and directors of DVI; (2) Dolphin Medical Inc., PresGar Imaging, LLC, OnCure Medical Corp., and Radnet Management, Inc., which were each closely associated with DVI; and (3) Merrill Lynch & Co., Inc., a financial advisor to DVI, an underwriter in many of its securitization transactions, and a substantial lender to the company.  Plaintiffs also assert claims under § 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t(a), against DVI's officers and directors, Thomas Pritzker and other Pritzker family members, and Pritzker Organization LLC, each of whom allegedly exerted influence over DVI and/or its officers and directors through their substantial holdings in DVI common stock and Notes.  All the defendants other than Deloitte and Clifford Chance have either settled their disputes or voluntarily opted out of these appeals.

Chance served as the company's lead corporate counsel, particularly advising on disclosure obligations under federal securities laws during the time period relevant to these appeals.

The Fifth Amended Complaint alleges that between August 10, 1999, and August 13, 2003, defendants engaged in a scheme designed to artificially inflate the price of DVI securities by: (1) refusing to write down millions of dollars of impaired assets; (2) double-pledging collateral and/or pledging ineligible collateral; (3) refusing to implement internal controls or to comply with those in place; and (4) concealing cash shortages by overstating revenues, assets, and earnings, and understating liabilities and expenses. Fifth Am. Compl. ¶ 9. Specifically, plaintiffs contend Deloitte committed securities fraud by wrongfully issuing unqualified, or "clean," audit reports for fiscal years 1999 to 2002, hiding DVI's improper accounting practices, and declining to force the company to disclose its fraudulent acts. *Id.* ¶¶ 424–85, 537–57. With respect to Clifford Chance, plaintiffs contend the law firm assisted DVI in its scheme by drafting fraudulent financial reports (in particular, DVI's 10-Q disclosure for the quarter ending September 30, 2002), conspiring with other defendants to hide material information about the company's financial condition, and deflecting inquiries from the SEC.[5] *Id.* ¶¶

---

[5]Unlike plaintiffs' claims against Deloitte and other defendants, which were asserted under Rule10b-5(a), (b), and (c), Fifth Am. Compl. ¶¶ 493, 522, 541, their claims against Clifford Chance are asserted only under Rule 10b-5(a) and (c),

363–409, 558–65.

Plaintiffs moved to certify a class under Fed. R. Civ. P. 23(b)(3) on behalf of DVI investors who purchased securities during the period in which the company allegedly made misrepresentations. The District Court granted plaintiffs' motion with respect to all defendants but Clifford Chance. The court analyzed the Rule 23 prerequisites and concluded that each was met. Specifically, it found plaintiffs met Rule 23(b)(3)'s predominance requirement by successfully invoking the fraud-on-the-market presumption of reliance. But the court found plaintiffs were not entitled to a presumption of reliance with respect to Clifford Chance because its conduct was not publicly disclosed and it owed no duty of disclosure to DVI's investors. Therefore, individual issues predominated over common issues and a class could not be certified against Clifford Chance. The court appointed lead plaintiffs as class representatives and defined the class as:

> All persons and entities who purchased or otherwise acquired the securities of DVI, Inc. (including its common stock and 9 7/8% Senior

---

*id.* ¶ 560, which make it unlawful to "employ any device, scheme, or artifice to defraud," and to "engage in any act, practice, or course of business which operates . . . as a fraud," respectively, 17 C.F.R. § 240.10b-5. We discuss the specific factual allegations plaintiffs make against Clifford Chance in Part III, *infra*.

Notes) between August 10, 1999 and August 13, 2003, inclusive and who were thereby damaged. Excluded from the class are Defendants; any entity in which a Defendant has a controlling interest or is a part or subsidiary of, or is controlled by a Defendant; the officers, directors, legal representatives, heirs, predecessors, successors and assigns of any of the Defendants; Lead Plaintiffs named in *WM High Yield Fund, et al. v. O'Hanlon, et al.*, No. 04-CV-3423 (E.D. Pa.).

Of the many defendants, initially, only Deloitte filed a petition for leave to appeal. *See* Fed. R. Civ. P. 23(f). After the District Court denied plaintiffs' motion for partial reconsideration of the court's order with respect to Clifford Chance, they too filed a petition for leave to appeal under Rule 23(f).[6]

To certify a class, the proposed class representative must satisfy each of the four requirements in Rule 23(a)—numerosity, commonality, typicality, and adequacy—and the putative class action must meet the requirements of one of the subsections of

---

[6]The District Court exercised jurisdiction under 15 U.S.C. § 78aa and 28 U.S.C. § 1331. We granted the Rule 23(f) petitions and have jurisdiction to decide the merits of these interlocutory appeals under 28 U.S.C. § 1292(e).

9

Rule 23(b).[7]  Fed. R. Civ. P. 23.  Plaintiffs seek certification under Rule 23(b)(3), which requires that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and

[7]"We review a class certification order for abuse of discretion." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2009).  "[A]buse of discretion . . . occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.  [W]hether an incorrect legal standard has been used is an issue of law to be reviewed *de novo*." *Id.* (citations and quotations omitted); *see Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165 (3d Cir. 2001).  Factual findings must be made by a preponderance of the evidence, and a court must address issues relevant to the requirements even if they overlap with the merits of the claim.  *See Hydrogen Peroxide*, 552 F.3d at 316, 320; *Newton*, 259 F.3d at 168. Accordingly, the court retains "broad discretion to control proceedings and frame issues for consideration under Rule 23." *Hydrogen Peroxide*, 552 F.3d at 310. The district court must supervise the process "'to achieve the most effective balance that expedites an informed certification determination without forcing an artificial and ultimately wasteful division between 'certification discovery' and 'merits discovery.'"" *Id.* at 319 n.20 (quoting Fed. R. Civ. P. 23 Advisory Comm. note, 2003 amendments).

efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These twin requirements are known as predominance and superiority.

The only Rule 23 requirement raised on appeal is predominance.[8] Predominance requires that "[i]ssues common to the class . . . predominate over individual issues . . . ." *Hydrogen Peroxide*, 552 F.3d at 311 (quotation omitted). Each element of a claim is examined "through the prism" of Rule 23(b)(3). *Id.* "[T]he task for plaintiffs at class certification is to demonstrate that the element of [the legal claim] is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 311–12. Although the requirement is "readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citing Advisory Comm. notes, 1966 amendments), "it does not follow that a court should relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims fall within one of those substantive categories," *Hydrogen Peroxide*, 553 F.3d at 322.

---

[8]Some of Deloitte's arguments to rebut the presumption of reliance implicate typicality, and this is how the District Court analyzed them. *See In re DVI, Inc. Sec. Litig.*, 249 F.R.D. 196, 202-03 (E.D. Pa. 2008). On appeal, Deloitte limits its arguments to the Rule 23(b) predominance requirement, and does not contest the District Court's typicality findings.

11

Plaintiffs assert claims under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.[9]  The elements of a §

---

[9]Section 10(b) makes it:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary and appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Under this statute, the SEC promulgated Rule 10b-5, which makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

10(b) private action are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

The parties dispute the reliance element of plaintiffs' claims. Reliance, also known as transaction causation, "establishes that but for the fraudulent misrepresentation, the investor would not have purchased or sold the security." *Newton*, 259 F.3d at 172. Reliance may be proven directly, but "[r]equiring proof of individualized reliance from each member of [a] proposed plaintiff class effectively would [prevent plaintiffs] from proceeding with a class action, since individual issues then would . . . overwhelm[] the common ones." *Basic, Inc. v. Levinson*, 485 U.S. 224, 242 (1988). If reliance must be individually proven, a proposed class cannot meet the Rule 23(b) predominance requirement.

In order to facilitate securities class-actions, the Supreme Court established a rebuttable presumption of class-wide

------

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

13

reliance based on the fraud-on-the-market theory.[10] *Id.* at 245-47. "'The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . .'" *Id.* at 241-42 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160-61 (3d Cir. 1986)) (alteration in original). This hypothesis is known as the efficient capital market hypothesis.

The Supreme Court appears to have endorsed the semi-strong version of the efficient capital market hypothesis. *See Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010); *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 10 n.16 (1st Cir. 2005). That version assumes stock prices reflect all publicly available information, but not privately held information.[11] *See*

---

[10]The Supreme Court established another presumption of reliance in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). The *Affiliated Ute* presumption is generally applicable only when material information is withheld from investors by a defendant having an affirmative duty of disclosure. *See id.* at 153-54; *Stoneridge*, 552 U.S. at 159.

[11]The weak form of the hypothesis assumes stock prices are independent of past performance because the market's valuation of the security already includes all historical information; the strong form of the hypothesis assumes stock prices reflect all

14

*Schleicher*, 618 F.3d at 685. Accordingly, investors who buy or sell securities at the price set by "an impersonal, well-developed market" do so "in reliance on the integrity of that price." *Basic*, 485 U.S. at 247. "Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed . . . ." *Id.* Thus, when the presumption of reliance is successfully invoked, the predominance requirement is met with respect to the element of reliance.

To invoke the fraud-on-the-market presumption of reliance, plaintiffs must show they traded shares in an efficient market, *Semerenko v. Cendant Corp.*, 223 F.3d 165, 178 (3d Cir. 2000), *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1419 n.8 (3d Cir. 1997), and the misrepresentation at issue became public, *Stoneridge*, 552 U.S. at 159. Once the presumption of reliance is successfully invoked, the court presumes "(1) that the market price of the security actually incorporated the alleged misrepresentations, (2) that the plaintiff actually relied on the market price of the security as an indicator of its value, and (3) that the plaintiff acted reasonably in relying on the market price of the security." *Semerenko*, 223 F.3d at 178-79. But a defendant may rebut the presumption of reliance by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price . . . ."

information, both private and public, such that even insiders cannot outperform the market. *See Schleicher*, 618 F.3d at 685.

15

*Basic*, 485 U.S. at 248; *see also Semerenko*, 223 F.3d at 179 ("The fraud on the market theory of reliance . . . creates only a presumption, which a defendant may rebut by raising any defense to actual reliance.").

Deloitte's rebuttal arguments also implicate loss causation, a distinct legal element of § 10(b) and Rule 10b-5 claims. Loss causation is different from reliance and requires "a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also* 15 U.S.C. § 78u-4(b)(4) (requiring a plaintiff in a private securities action to "prov[e] that the act or omission of the defendant alleged to violate [a federal securities law] caused the loss for which the plaintiff seeks to recover damages").[12]

---

[12]Private securities complaints must "specify each statement alleged to have been misleading [] [and] the reason or reasons why the statement is misleading . . . ." 15 U.S.C. § 78u-4(b)(1). The Private Securities Litigation Reform Act codified the loss causation element of a private securities cause of action, requiring a plaintiff to "prov[e] that the act or omission of the defendant alleged to violate [a federal securities law] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "[T]he general rules of pleading require that the plaintiff also *plead* [loss causation] in his complaint." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 163, 185 (4th Cir. 2007). The complaint must "not only state the allegations with factual particularity, but . . . also describe the sources of information with particularity, providing the who, what, when,

Although a drop in a security's price may be a result of the correction of a previous misrepresentation, it may also have been caused by "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura*, 544 U.S. at 343. Therefore, at trial plaintiffs must "show that the revelation of th[e] misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007). The requirement ensures "that the individual allegedly responsible for the misrepresentation or omission does not become an insurer against all the risks associated with the investment." *Id.* at 425 n.3.

In adopting the rebuttable fraud-on-the-market

---

where and how of the sources, as well as the who, what, when, where and how of the information those sources convey." *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

Complaints also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

17

presumption of reliance in *Basic*, the Supreme Court injected nascent economic theory into legal doctrine. *See Basic*, 485 U.S. at 252-53 (White, J., concurring in part and dissenting in part). As a consequence, there has been some "[c]onfusion and contradiction in court rulings." *Id.* at 252. These appeals present several such tensions and contradictions.

## II.

Deloitte challenges the District Court's application of the fraud-on-the-market presumption of reliance and its finding that predominance has been satisfied. Deloitte also contends the court's factual findings on market efficiency were an abuse of discretion and that loss causation—a distinct element of the legal claims—must be established as a prerequisite before invoking the presumption of reliance. Finally, even if lead plaintiffs successfully invoked the presumption of reliance, Deloitte contends it has rebutted the presumption by demonstrating individual, as opposed to common, issues of loss causation predominate, and by demonstrating that plaintiffs relied on a strategy crafted to exploit market inefficiencies.

## A.

Market efficiency is the cornerstone of the fraud-on-the-market presumption of reliance. As noted, to invoke the presumption of reliance, plaintiffs must show they traded securities in an efficient market, *Semerenko*, 223 F.3d at 178, *Burlington*, 114 F.3d at 1419 n.8, and the misrepresentations at

issue became public, *Stoneridge*, 552 U.S. at 159.[13]  Because proof of an efficient market is required to invoke the presumption of reliance, which in turn is necessary to meet the Rule 23(b)(3) predominance requirement, a district court should conduct a rigorous market efficiency analysis.  *See Hydrogen Peroxide*, 552 F.3d at 309-310.  This may, in some cases, include weighing conflicting expert testimony and making factual findings.  *Id.* at 307, 323.

**1.**

The District Court examined plaintiffs' and defendants' expert reports and the parties' arguments on market efficiency. The court considered several factors[14] in its analysis of DVI's

---

[13]Deloitte does not dispute the alleged misrepresentations became public.

[14]The District court considered efficiency factors set forth in *Cammer v. Bloom,* 711 F. Supp. 1264, 1286-87 (D.N.J. 1989): (1) the average weekly trading volume; (2) the number of security analysts following and reporting on the security; (3) the extent to which market makers traded the security; (4) the issuer's eligibility to file an SEC registration Form S-3; and (5) the cause-and-effect relationship between material disclosures and changes in the security's price.  In analyzing DVI's common stock, the court also examined two factors set forth in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001): (1) the company's market capitalization; and (2) the size of the

three securities (common stock, the 1997 Notes, and the 1998 Notes),[15] and concluded the market in which each traded was

public float for the security. Finally, the court considered two factors evaluated in *In re Polymedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 273, 276-77 (D. Mass. 2006): (1) the ability to short sell the security; and (2) the level of autocorrelation. Three factors—market capitalization, public float, and short-selling opportunities—were not considered with reference to the two tranches of Notes because they are not applicable to debt securities.

[15]The District Court also treated the two tranches—the 1997 and 1998 Notes—as one security for purposes of evaluating whether they traded in efficient markets. *DVI*, 249 F.R.D. at 214. It found the tranches had identical terms, covenants, and provisions. *Id.* Moreover, it credited the plaintiffs' expert's report showing a 99.2% price correlation between the tranches. *Id.* The court recognized the price data for the 1998 Notes was incomplete for part of the class period, but because this information was publicly available for the 1997 Notes it applied the 1997 price information to the 1998 Notes. *See id.* at 214 n.32. This finding was not clearly erroneous. Accordingly, it was not an abuse of discretion to treat the two tranches as one security for the purposes of analyzing the efficiency of the market.

The District Court analyzed the market in which the two tranches of Notes were traded using many of the same factors it

efficient.

On appeal, Deloitte challenges several findings of fact, contending the court simply tallied efficiency factors rather than engaging in a thoroughgoing market efficiency analysis. Significantly, Deloitte contests the court's findings about the cause-and-effect relationships between public disclosures and the securities' price changes. Plaintiffs, in turn, defend the soundness of the District Court's analysis and emphasize that the listing of DVI's common stock and 1997 Notes on the NYSE weighs in favor of a finding of market efficiency.

Securities markets like the NYSE and the NASDAQ are "open and developed," *see Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000), and are therefore "well suited for application of the fraud on the market theory," *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990). Accordingly, the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency. *See Oran*, 226 F.3d at 282; *see also Schleicher*, 618 F.3d at 682; *Freeman*, 915 F.2d at 199. DVI securities, including its common stock and its 1997 Notes, which the District Court held were identical to the 1998 Notes, traded on the NYSE.

---

applied to DVI's common stock. On the facts here, applying the fraud-on-the-market presumption of reliance to bond holders was not clearly erroneous. *See In re Enron Corp. Sec. Derivative & ERISA Litig.*, 529 F. Supp. 2d 644, 768 (S.D. Tex. 2006).

Other factors may be relevant to assessing market efficiency, particularly when securities are traded in markets less open and well-developed than those of the major exchanges, but even for the major exchanges as well. The type of security (stocks, bonds, convertibles, derivatives, etc.), the company's industry, the security's price, and other considerations should guide district courts in deciding which factors are most relevant to an efficiency analysis.[16] However, because an efficient market is one in which "information important to reasonable investors . . . is immediately incorporated into stock prices," *Burlington*, 114 F.3d at 1425 (citation omitted), the cause-and-effect relationship between a company's material disclosures

---

[16]We have noted the *Cammer* factors may be instructive depending on the circumstances. *See Hayes v. Gross*, 982 F.2d 104, 107 n.1 (3d Cir. 1992). Many of our sister circuits have also approved of their use. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008) (accepting the use of the *Cammer* factors as an "analytical tool" for determining market efficiency); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 508 (1st Cir. 2005) (affirming application of the *Cammer* factors); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (affirming application of *Cammer* and *Krogman* factors); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004) (citing the *Cammer* factors favorably); *Binder v. Gillespie*, 184 F.3d 1059, 1064-65 (9th Cir. 1999) (citing the *Cammer* factors with approval); *Freeman*, 915 F.2d at 198-99 (citing the *Cammer* factors).

22

and the security price is normally the most important factor in an efficiency analysis,[17] *see, e.g.*, *Cammer*, 711 F. Supp. at 1287.

Here, the District Court found causal relationships between disclosures about DVI and its securities' prices. In analyzing DVI's common stock, the court examined an event study conducted by plaintiffs' expert, which found that, of the 34 days during the class period when DVI's common stock saw significant price changes, 20 of those days coincided with news releases. *See DVI*, 249 F.R.D. at 211. The court held this percentage established a sufficient causal relationship weighing in favor of market efficiency. *See id.* at 211-12. In analyzing DVI's Notes, the court referenced plaintiffs' event study that employed the Option Adjusted Spread, which subtracts the risk-free interest yield from the yield of the Notes, and found that on 17 of the 26 days (or 65% of the time) when the Notes' yield experienced a significant price change, a news disclosure also occurred within two days. *See id.* at 215-16. The court found this factor supported a finding of market efficiency for both the stock and the Notes.

On appeal, Deloitte makes two primary arguments related to cause-and-effect. First, it contests whether 60% and 65% correlations between news releases and price changes in DVI

---

[17]This factor is related to, but broader than, loss causation. In analyzing market efficiency, courts often look to all corporate disclosures and news events. Conversely, in analyzing loss causation, courts generally look to corrective disclosures.

common stock and Notes, respectively, demonstrate an efficient market. The District Court credited two studies offered by plaintiffs, which found that on average "only about one-third of statistically significant changes in the stock price of publicly traded companies are actually associated with identifiable news or events." *DVI*, 249 F.R.D. at 212. Here, the correlation was at least twice as high. The District Court's factual findings that 60% and 65% correlations between news releases and price changes in DVI stock and Notes weigh in favor of market efficiency were not clearly erroneous.

Deloitte also contends the market price reacted too slowly to news releases about DVI to demonstrate efficiency. The court found that although DVI's stock price sometimes took up to two days to incorporate new information, "on the vast majority of occasions the information was incorporated into the stock price on the same day." *DVI*, 249 F.R.D. at 211. Deloitte contends this is insufficient to demonstrate market efficiency.

We have addressed the speed with which information is incorporated into market price and explained that because a perfectly efficient market is not attainable, *cf.*, *Peil*, 806 F.2d at 1161 n.10 (describing the market in information as "nearly perfect"), we do not require that public information be absorbed "instantaneously," *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 269 (3d Cir. 2005). Applying this standard, we have held that a market is inefficient when a price does not decrease within four days following an alleged corrective disclosure. *See Oran*, 226 F.3d at 283 (price increased for several days following the

disclosure); *see also Merck*, 432 F.3d at 269 (same). Here, the District Court found most of the information was incorporated into the price within one day. That some information took two days to affect the price does not undermine a finding of efficiency. The District Court's finding that cause-and- effect weighs in favor of a finding of market efficiency was not clearly erroneous.

In sum, the District Court weighed efficiency factors involving the markets in which DVI's common stock and senior Notes traded. Granting weight to the listing of DVI's stock and Notes on the NYSE, and to the cause-and-effect relationships between news releases and DVI's securities' prices, the court concluded that each market was efficient. The legal standards it used to evaluate efficiency were proper, its factual findings were not clearly erroneous, and its weighing of the factors was not an abuse of discretion. Accordingly, the court did not abuse its discretion in permitting plaintiffs to invoke the fraud-on-the-market presumption of reliance.

**2.**

Deloitte urges us to adopt the view that plaintiffs must prove loss causation at the class certification stage in order to invoke the fraud-on-the-market presumption of reliance. *See Oscar Private Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 269 (5th Cir. 2007)*; see also Archdiocese of Milwaukee Supporting Fund v. Halliburton Co.*, 597 F.3d 330, 335 (5th Cir. 2010), *cert. granted sub nom. Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 856 (2011); *Fener v. Operating*

*Eng'rs Constr. Indus. and Misc. Pension Fund (LOCAL 66)*, 579 F.3d 401, 410 (5th Cir. 2009). "Loss causation demonstrates that the fraudulent misrepresentation actually caused the loss suffered." *Newton*, 259 F.3d at 173. In *Oscar*, the court explained that "because loss causation speaks to the semi-strong efficient market hypothesis on which classwide reliance depends," it relates to the presumption of reliance. *See Oscar*, 487 F.3d at 269. Thus, *Oscar* connected loss causation and the fraud-on-the-market presumption of reliance "through the lens of market efficiency." *See* John R. Guenard, Oscar Private Equity Investments v. Allegiance Telecom, Inc.: *The Fifth Circuit Requires Proof of Loss Causation to Trigger the Fraud-on-the-Market Presumption of Reliance*, 82 Tul. L. Rev. 2467, 2472 (2008).

The *Oscar* court's analysis hinged on the relationship between loss causation and market impact. Market impact is the effect of a disclosure on the market price. In an efficient market, every material disclosure should be reflected in the market price. Market impact is necessary to prove loss causation because a misrepresentation that does not move the market price is incapable of causing a loss. *Cf. Dura*, 544 U.S. at 343. But market impact alone is insufficient to demonstrate loss causation. Investors must go beyond a correlation between market movement and disclosure to demonstrate the injurious price impact was caused by the material misrepresentation at issue rather than by some other intervening cause or causes that "taken separately or together account for some or all of that lower price." *Id.*

26

In *Oscar*, the court explained that because the fraud-on-the-market presumption of reliance requires an efficient market, and a disclosure that does not result in a price change suggests an inefficient market, market impact, and therefore loss causation, must go to the core of the reliance requirement.[18] *See* 487 F.3d at 269.  Believing that *Basic* "allows each of the circuits room to develop its own fraud-on-the-market rules," *id.* at 264 (citation omitted), the court held plaintiffs must establish loss causation at the class certification stage as a prerequisite to invoking the fraud-on-the-market presumption of reliance, *id.* at 269.

*Oscar* appears to shift the burdens announced in *Basic*, undermining the purpose of the presumption of reliance.  *See In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 483 (2d Cir. 2008).  We do not think plaintiffs must establish loss causation as a prerequisite to invoking the presumption of

---

[18]In most cases, unmoored from the presumption of reliance, loss causation is unlikely to defeat class certification because it is generally susceptible of class-wide proof.  *See Hydrogen Peroxide*, 552 F.3d at 311-12; *Schleicher*, 618 F.3d at 686-87.  For purposes of class certification, plaintiffs must show evidence relating to the element of loss causation is common to the entire class, but do not need to prove loss causation itself.  A trial court will have to "pin down *when* the stock's price was affected by any fraud," but "[t]hat decision . . . can be made on a class-wide basis, because it affects investors in common." *Schleicher*, 618 F.3d at 687.

reliance in the first instance.[19]  Accordingly, we decline to require plaintiffs to demonstrate loss causation at class certification.  *See Schleicher*, 618 F.3d at 687; *Salomon*, 544 F.3d at 483.

## B.

Once established, the presumption of reliance may be rebutted by "any defense to actual reliance."  *Semerenko*, 223 F.3d at 179; *see Basic*, 485 U.S. at 248.  The Supreme Court

[19]In *Newton*, an atypical securities fraud action, we upheld a denial of class certification because the plaintiffs could not meet the Rule 23(b)(3) predominance requirement—plaintiffs were unable to demonstrate injury using class-wide proof.  *See Newton*, 259 F.3d at 192-93.  The plaintiff investors in *Newton* alleged defendant brokers executed ordered trades at the National Best Bid and Offer (NBBO) price even though lower prices were available using private services.  *See id.* at 170. Plaintiffs contended defendants traded at the higher prices to intentionally inflate their profit margins, and that defendants engaged in "crossing" transactions between sellers and buyers in order to capture the spread between the NBBO and a more favorable price as their fee.  *Id.*  We explained that the alleged fraud was an atypical securities fraud stating, "plaintiffs' claims do not involve an omission or misrepresentation that affected the value of a security in an efficient market.  Therefore, a presumption of reliance based on this theory would be inappropriate."  *Id.* at 175-76.

28

provided a non-exhaustive list of ways that defendants can rebut the presumption, including by showing: (1) the market did not respond to the alleged misrepresentations; (2) the misrepresentations were immaterial; (3) a plaintiff did not actually rely on the misrepresentations; or (4) a plaintiff would have sold the securities without relying on the integrity of the market. *See Basic*, 485 U.S. at 248-49; *Semerenko*, 223 F.3d at 179. Deloitte contends rebuttal of the presumption of reliance must be considered at the class certification stage, and, further, that it has rebutted the presumption of reliance in this case because it has shown lead plaintiffs cannot establish loss causation for the entire class, and because lead plaintiffs relied on a strategy of exploiting inefficiencies in the small-cap market bolstered by receipt of inside information from DVI.

In a recent opinion, the Court of Appeals for the Second Circuit interpreted *Basic* to mean "that a successful rebuttal *defeats* certification by defeating the Rule 23(b)(3) predominance requirement. Hence, the court must permit defendants to present their rebuttal arguments before certifying a class . . . ."[20] *Salomon*, 544 F.3d at 485 (quotation and citation

_____

[20]In *Basic*, the Court explained in a footnote:

> We note there may be a certain incongruity between the assumption that Basic shares are traded on a well-developed, efficient, and information-hungry market, and the allegation that such a market could remain misinformed, and its valuation of Basic shares depressed, for 14

29

omitted).  The Second Circuit heeded defendants' request to "attempt to rebut the fraud-on-the-market presumption" with evidence "that the market price was not affected by the alleged misstatements," *id.*, by vacating the district court's opinion and holding that defendants have the burden "to show that the allegedly false or misleading material statements did *not* measurably impact the market price of the security," *id.* at 486 n.9.

Evidence an allegedly corrective disclosure did not

---

months, on the basis of three public statements. Proof of that sort is a matter for trial, throughout which the District Court retains the authority to amend the certification order as may be appropriate.  Thus, we see no need to engage in the kind of factual analysis the dissent suggests that manifests the "oddities" of applying a rebuttable presumption of reliance in this case.

485 U.S. at 249 n.29.  This footnote appears to have responded to the dissent in *Basic* and was not essential to *Basic*'s holding.  *See id.* at 259-63 (White, J., concurring in part and dissenting in part) (discussing the factual peculiarities of the trades in issue). Taken literally, note 29 may even appear to preclude a court from evaluating evidence presented by a defendant at class certification to demonstrate the market is inefficient.  But this widespread practice is permitted even in circuits that do not allow the examination of rebuttal evidence at the class certification stage.  *See, e.g.*, *Polymedica*, 432 F.3d at 17-19.

affect the market price undermines the fraud-on-the-market presumption of reliance for several reasons. "An efficient market for good news is an efficient market for bad news." *Merck*, 432 F.3d at 271. A demonstration the market did not assimilate information about the security into the market price—either when the alleged misrepresentation occurred, or when an alleged corrective disclosure occurred—may undercut the general claim of market efficiency or demonstrate market inefficiency relating to the securities in issue.

Even if a plaintiff could establish the market was efficient notwithstanding a lack of market impact, under our precedents the lack of market impact may indicate the misstatements were immaterial—a distinct basis for rebuttal. *See Semerenko*, 223 F.3d at 179 n.7. When a plaintiff alleges securities traded in an efficient market, we have held information immaterial as a matter of law if that information did not affect the security's price. *See Burlington*, 114 F.3d at 1425; *Oran*, 226 F.3d at 283; *Merck*, 432 F.3d at 269. In an otherwise efficient market, the failure of a corrective disclosure to affect the market price may therefore serve as a rebuttal to the presumption of reliance because it renders the misstatement immaterial as a matter of law.

Accordingly, we believe rebuttal of the presumption of reliance falls within the ambit of issues that, if relevant, should be addressed by district courts at the class certification stage. The District Court here did not err in evaluating Deloitte's rebuttal arguments. Moreover, we agree with the Second Circuit

that a defendant's successful rebuttal demonstrating that misleading material statements or corrective disclosures did not affect the market price of the security defeats the presumption of reliance for the entire class, thereby defeating the Rule 23(b) predominance requirement.

**1.**

Deloitte contends on appeal that it has rebutted the presumption of reliance by showing plaintiffs cannot demonstrate loss causation for all class members. But Deloitte does not argue or demonstrate the alleged corrective disclosures did not affect the market price. Instead, Deloitte contends some "in-and-out" traders—investors who sold their securities before the first alleged corrective disclosure—suffered no loss and therefore loss causation cannot be shown for those traders rebutting the presumption of reliance. On these facts, we disagree.

As previously discussed, loss causation considered separate and apart from the presumption of reliance will rarely defeat the Rule 23(b)(3) predominance requirement because the evidence used to prove loss causation in fraud-on-the-market cases is often common to the class. *See Hydrogen Peroxide*, 552 F.3d at 311-12. This is the case where, as here, the parties' dispute surrounding loss causation centers on the determination of the date of a corrective disclosure or disclosures. *See Schleicher*, 618 F.3d at 686-87. Moreover, a plaintiff need not demonstrate loss causation as a prerequisite to invoking the fraud-on-the-market presumption of reliance. *See* Part II.A.2

32

*supra*. But evidence introduced by a defendant at the class certification stage demonstrating an allegedly corrective disclosure did not move the market—that there was no market impact and therefore no loss causation—may in some circumstances rebut the presumption of reliance and in turn defeat predominance.

The parties dispute whether the first alleged corrective disclosure occurred on August 13, 2003, the day DVI announced it would file for bankruptcy protection, or on some earlier date going back to and possibly preceding May 20, 2003, the day Deloitte resigned as DVI's certified public accountant.[21] Before the District Court, Deloitte briefed this issue as a class definition issue and not as a rebuttal to the presumption of reliance. Citing *Dura*, the court recognized that persons who sold their securities before the first corrective disclosure would face a difficult task of establishing damages and therefore also of loss causation, but declined to narrow the class dates, holding this a factual question that need not be addressed at the class certification stage. *DVI*, 249 F.R.D. at 219. The District Court certified the class to include "[a]ll persons and entities who purchased or otherwise acquired the securities of DVI . . . between August 10, 1999 and August 13, 2003, inclusive and who were thereby damaged." In oral argument before the District Court,

_____

[21]The District Court, ruling on a motion for summary judgment, subsequently held the September 25, 2002, May 13, 2002, June 5-6, 2003, and July 16, 2003, disclosures were not corrective disclosures as a matter of law.

33

supplemental filings with the District Court, and now on appeal, Deloitte contends the occurrence of these in-and-out trades within the class period rebuts the presumption of reliance and defeats predominance because some traders may have suffered no loss and therefore would be unable to demonstrate loss causation.[22]

At bottom, Deloitte urges us once again, albeit under a different legal theory, to require the District Court to rule on the earliest date a corrective disclosure occurred—a ruling that on its face does not implicate predominance because it would be made using evidence common to the class. *See Hydrogen*

---

[22]As a preliminary matter, we note the issue of which individuals and entities are included in the putative class is primarily relevant to class definition. Here, the in-and-out traders referenced by Deloitte are excluded from the class, which is limited by its plain terms to individuals or entities who were damaged by their purchases. We question whether the District Court conformed with Fed. R. Civ. P. 23(c)(1)(B), requiring trial courts granting a motion for class certification to "define the class and the class claims, issues, or defenses . . . ." We recently held this rule, which was part of the 2003 amendments to Rule 23, created an affirmative duty for district courts to include a "readily discernable, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Wachtel v. Guardian Life Ins. Co. of Am.*, 453 F.3d 179, 187-88 (3d Cir. 2006). But Deloitte did not raise the issue of proper class definition on appeal. Accordingly, we will not reach it.

34

*Peroxide*, 552 F.3d at 311-12. Deloitte attempts to frame this as a predominance problem by inserting the issue into the presumption of reliance framework. But Deloitte has not carried its evidentiary burden on rebuttal.

Although *Basic* permits rebuttal of the presumption of reliance, it places the burden of rebuttal on defendants. *See Basic*, 485 U.S. at 248. We have held "[g]enuine disputes with respect to the Rule 23 requirements must be resolved, after considering all the relevant evidence submitted by the parties." *Hydrogen Peroxide*, 552 F.3d at 324. Here, Deloitte offers no evidence in support of its rebuttal argument—it merely notes the transcript of oral argument of the certification motion where it raised this issue before the District Court with reference to class definition. Before the District Court, and now on appeal, Deloitte provides no evidence about the prevalence of in-and-out trades during the class period or about the identity of traders whose only trades were in-and-out transactions. Accordingly, Deloitte has not met its burden.[23]

---

[23]Deloitte attempts to recast a claim about damages—loss—to one about loss causation. *See Newton*, 259 F.3d at 177 ("it is necessary . . . to separate the concept of economic loss from the issue of loss causation."). Outside of its rebuttal arguments, Deloitte does not contest the sufficiency of proof of damages for the purposes of class certification. This is unsurprising since, as a typical securities fraud action where "the plaintiff shareholder alleges that a fraudulent misrepresentation or omission has artificially inflated the price

**2.**

Defendants also introduced rebuttal evidence before the District Court contending that lead plaintiffs relied on non-public information rather than on the integrity of the market price.[24]  On appeal, Deloitte reiterates its argument that lead

of a publicly-traded security, with the plaintiff investing in reliance on the misrepresentation or omission," *McCabe*, 494 F.3d at 425, damages as well as loss causation are susceptible of determination through evidence common to the class, *see Newton*, 259 F.3d at 180.  Deloitte's rebuttal argument here is simply that class-wide loss causation cannot be proven if some investors sustained no damages.  This does not bear on market efficiency generally, or with reference to the specific misrepresentations.  It does not demonstrate immateriality, nor does it undercut actual reliance or speak to the reasonableness of reliance.  *Cf. Semerenko*, 223 F.3d at 178-79.

[24]Deloitte initially introduced this rebuttal evidence before the District Court in the context of the Rule 23(a) typicality requirement.  If a unique defense might "play a major role in the litigation," there is a risk that absent class members will suffer if class representatives do not focus on concerns common to the class.  *See Beck v. Maximus, Inc.*, 457 F.3d 291, 300 (3d Cir. 2006).  The District Court analyzed defendants' rebuttal arguments under this framework, and concluded that they would not become "a major focus of the litigation."  *See DVI*, 249 F.R.D. at 202.  This was not an abuse of discretion.  On appeal,

plaintiffs' investment strategy was to capitalize on inefficiencies in the small-cap market by trading securities it believed, based on public information and information received from DVI, were incorrectly priced. In essence, Deloitte argues that because plaintiffs hoped to be successful arbitrageurs they could not have relied on the integrity of the market price and the presumption of reliance is therefore rebutted defeating predominance.

The District Court examined and rejected evidence that lead plaintiffs relied on inside information from DVI in making trades. Before the District Court, Deloitte contended research notes taken by or attributed to Kenneth Grossman demonstrated lead plaintiffs' receipt of material non-public information from DVI management on numerous occasions,[25] which were

---

Deloitte raises these issues solely in the context of the Rule 23(b) predominance requirement.

[25]Some access to company management is permissible because it facilitates the dissemination of publicly available company news, and is often inevitable when institutional investors are taking large equity stakes in companies. *See In re WorldCom Inc. Sec. Litig.*, 219 F.R.D. 267, 282 (S.D.N.Y. 2003) ("[Institutional] investors are likely to use advisors, to invest conservatively in securities they consider undervalued by the market, and on occasion even to communicate directly with the company in which they are investing to verify or better evaluate its public disclosures. Making careful investment

37

correlated with lead plaintiffs' trades in DVI securities. The court reviewed plaintiffs' comparison of the description of each research note with information publicly available as of the date of the research note, and made a factual finding "that the communications from DVI insiders were either immaterial or publicly available, having been disclosed through public conference calls, press releases, SEC filings or other publicly available materials." *DVI*, 249 F.R.D. at 202. The court additionally noted that only two of the numerous research notes Deloitte contended reflected non-public information were correlated with lead plaintiffs' purchase of DVI securities. *Id.* Our review of the record demonstrates that these factual findings were not clearly erroneous.[26]

Because Deloitte has not proffered evidence lead plaintiffs received and traded on material, non-public, information, Deloitte's contention is limited to the naked argument that evidence an investor believes successful arbitrage

---

decisions does not disqualify an investor . . . from relying on the presumption of reliance . . . ."); *cf.* 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I) (instructing district courts to appoint as lead plaintiff the "person or group of persons that . . . has the largest financial interest in the relief sought by the class . . . .").

[26]The District Court applied these factual findings to the Rule 23(a) typicality requirement, which Deloitte does not contest on appeal, but they are equally applicable in the present predominance challenge.

is possible rebuts the presumption of reliance. Deloitte essentially argues that a subjective belief the market is not perfectly efficient is sufficient to demonstrate plaintiffs did not rely on the integrity of the market price. In support, Deloitte cites *Zlotnick v. Tie Communications*, 836 F.2d 818 (3d Cir. 1988), an appeal from a motion to dismiss in which we held that certain short-selling investors in defendants' company could not invoke a presumption of reliance. Deloitte urges us to expand *Zlotnick*'s narrow holding to the facts here—namely that plaintiffs sought to exploit temporary informational inefficiencies in the market to purchase undervalued securities they expected to rise in price as the market digested relevant public information. *Zlotnick* does not stand for such a broad proposition—its holding is limited to the applicability of the fraud-on-the-market presumption of reliance in a short-selling context—a complex and controversial issue that is not before us. *See* 836 F.2d at 823.

In *Basic*, the Court explained that "a free and open public market" is based on "a situation where the market price reflects as nearly as possible a just price." 485 U.S. at 246 (quotation omitted). The Court went on to explain that "most publicly available information is reflected in market price," and "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Id.* at 247. We read *Basic* to mean that an investor who seeks to use the fraud-on-the-market presumption of reliance must show reliance on publicly available information in making the investment decision regardless of the investor's personal belief as to the

39

security's value. Reliance on the "integrity of the market price," *id.*, means only that an investor relies on the fact that the price reflects publicly available information as the market digests it, and nothing more. The careful research of sophisticated institutional investors, who are preferred as class representatives, *see* 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I), constitutes an important means by which publicly available information becomes incorporated into market prices. *See WorldCom*, 219 F.R.D. at 282. Here, plaintiffs adequately demonstrated the markets for DVI securities were efficient—that is, they absorbed publicly available information about DVI and reflected it in the securities' prices. Defendants have not made an adequate showing that plaintiffs relied on anything other than publicly available information obtained through careful research that is commonplace among sophisticated institutional investors. Deloitte's rebuttal is therefore unavailing. Plaintiffs are entitled to a presumption of reliance.

Accordingly, for the foregoing reasons, we will affirm the order of the District Court.

## III.

Plaintiffs appeal the District Court's denial of class certification with respect to Clifford Chance. Because this appeal raises different issues than those presented in Deloitte's appeal, a brief summary of the factual allegations may be helpful. On October 11, 2002, Deloitte issued a Management Letter in connection with its annual audit of DVI. The letter

40

identified material weaknesses in DVI's internal controls for monitoring non-performing assets and assessing impaired loans. Deloitte informed DVI that federal securities laws—the Sarbanes-Oxley Act of 2002 (SOX), Pub. L. No. 107-204, 116 Stat. 745, in particular—required disclosure of these weaknesses in DVI's next Form 10-Q. According to plaintiffs, disclosing this information would have forced DVI to write down millions of dollars of assets and reverse income accrued on impaired loans. DVI initially prepared a portion of the 10-Q for the quarter ending September 30, 2002, revealing the material weaknesses and faxed it to John Healy, a partner at Clifford Chance. Healy allegedly directed DVI not to release that version of the 10-Q. Instead, according to plaintiffs, Healy devised a "workaround" scheme to avoid having to disclose the weaknesses.[27] The parties dispute Clifford Chance's role in

---

[27]The term workaround was used by CFO Garfinkel in his affidavit. The specifics of the workaround are complicated, but in essence Healy's alleged plan was to take advantage of a loophole in SOX by conducting a "special audit" of DVI's internal controls during the two-week period following the issuance of the Management Letter, but before the deadline for filing the 10-Q. The audit was meant to show there were no material weaknesses in DVI's internal controls, which allowed DVI to avoid disclosure to the SEC under the SOX guidelines.

41

drafting the misleading portions of the 10-Q,[28] but they do not dispute that the final version did not state there were material weaknesses in DVI's internal controls.

The Fifth Amended Complaint asserts violations of Rule 10b-5(a) and (c), but not Rule 10b-5(b), against Clifford Chance. Fifth Am. Compl. ¶ 560. As noted, subsections (a) and (c) make fraudulent conduct unlawful; subsection (a) makes it unlawful "[t]o employ any device, scheme, or artifice to defraud," 17 C.F.R. § 240.10b-5(a); subsection (c) makes it unlawful "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud," *id.* § 240.10b-5(c). In contrast, subsection (b) makes it unlawful "[t]o make any untrue statement of material fact" or to omit a material fact necessary to clarify prior misleading statements. *Id.* § 240.10b-

---

[28]Clifford Chance devotes a significant portion of its reply brief to contesting plaintiffs' factual allegations. It contends there is no evidence showing Healy believed the Management Letter needed to be disclosed, or that any attorney at Clifford Chance drafted the 10-Q. The record appears to present some evidence to the contrary, but regardless, the resolution of these factual disputes is more appropriate at a merits stage of the proceeding. At this point, we are concerned only with whether plaintiffs' claims involve common questions of law and fact. *See Hydrogen Peroxide*, 552 F.3d at 311-12. Because plaintiffs' allegation that Clifford Chance created the misleading 10-Q is inherently common to all members of the class, we need not delve into the likelihood of success on the merits.

5(b). Consequently, the District Court only addressed plaintiffs' scheme liability claims under subsections (a) and (c).[29] It explained: "Lead Plaintiffs do not allege that Clifford Chance directly made any public misstatements that affected the market for DVI securities. Instead, Lead Plaintiffs argue that Clifford Chance should be held liable under section 10(b) because it participated in a scheme to defraud investor[s] in DVI." *DVI*, 249 F.R.D. at 217. The Court proceeded to analyze plaintiffs' scheme liability allegations under *Stoneridge*, which was also a scheme liability case, not a misstatement case.

As discussed in Part II.A. *supra*, to invoke the fraud-on-the-market presumption of reliance, plaintiffs must show they traded securities in an efficient market, *Semerenko*, 223 F.3d at 178, *Burlington*, 114 F.3d at 1419 n.8, and the misrepresentations at issue became public, *Stoneridge*, 552 U.S. at 159. Here, because "none of [Clifford Chance's] alleged conduct was publicly disclosed such that it affected the market for DVI's securities," *DVI*, 249 F.R.D. at 218, the District Court concluded that plaintiffs could not utilize the fraud-on-the-market presumption. Plaintiffs filed a motion for reconsideration, contending that *Stoneridge* created a "remoteness test" for establishing scheme liability, and that Clifford Chance's involvement in the alleged scheme was

---

[29]We refer to claims under Rule 10b-5(a) and (c) as "scheme liability claims" because they make deceptive conduct actionable, as opposed to Rule 10b-5(b), which relates to deceptive statements.

43

substantial enough to create primary liability. The court rejected this argument, holding that *Stoneridge* did not create such a test. Order on Lead Pls.' Mot. for Partial Recons. at 5-6 (Aug. 27, 2008).

On appeal, plaintiffs renew their arguments. They also argue Clifford Chance's deceptive conduct was communicated to the public, and that *Stoneridge* only requires public dissemination of the fraudulent acts, not public attribution of the acts to a particular defendant.[30]

---

[30]On appeal, plaintiffs also assert Clifford Chance is liable under Rule 10b-5(b) for actually making misstatements with respect to the aforementioned 10-Q. Presumably, this argument was made to circumvent *Stoneridge*, which was decided while the class certification motion was *sub judice*. Plaintiffs urge us to adopt a broad definition of what constitutes "mak[ing] any untrue statement of a material fact" under this subsection. *See* 17 C.F.R. § 240.10b-5(b). They rely primarily on a vacated panel opinion from our Court, which held that an actor can be primarily liable when he knowingly or recklessly plays such a substantial role in the creation of the statement that he could be said to be the author of that statement. *See Klein v. Boyd*, Fed. Sec. L. Rep. (CCH) P90, 136 (3d Cir. Feb. 12, 1998), *vacated, reh'g granted*, Fed. Sec. L. Rep. (CCH) P90, 165 (3d Cir. Mar. 9, 1998). The panel adopted this standard, known as the "creator" test, from an amicus brief filed by the SEC. *Klein* was vacated pending a rehearing en banc that did not occur because the case settled.

Plaintiffs waived their Rule 10b-5(b) theory of recovery when they failed to raise it before the District Court. *See Srein v. Frankford Trust Co.*, 323 F.3d 214, 224 n.8 (3d Cir. 2003) ("we will not consider issues that are raised for the first time on appeal absent compelling reasons." (quotation omitted)). Plaintiffs' argue the law firm was put on notice that it could be held primarily liable for misrepresentations under all three subsections of Rule 10b-5, *see* Lead Pls.' Reply Br. at 14; Lead Pls.' Reply in Supp. of Mot. for Leave to Supp. the Rec. at 2, and that they should not be precluded from refining class members' claims in the aftermath of *Stoneridge* because it was a groundbreaking decision. Reply in Supp. of Mot. 4 n.2. Although the Fifth Amended Complaint asserts that Clifford Chance participated in the drafting of DVI's 10-Q, it does not aver that the firm actually made a misrepresentation except as a predicate for the scheme liability allegations. Fifth Am. Compl. ¶¶ 562–63. Throughout the District Court proceedings, plaintiffs focused only on their scheme liability claim. Plaintiffs cite a brief they submitted to the District Court in response to Clifford Chance's notice of *Stoneridge* to show they asserted a misrepresentation claim under Rule 10b-5(b). Though the brief argued that Clifford Chance drafted and instigated the actionable disclosures made by DVI, it did so only in the context of asserting a scheme liability claim. *See* Lead Pls.' Resp. to Clifford Chance's Notice of Recent Authority Regarding Class Cert. at 14 ("Lead Plaintiffs have established reliance with respect to Clifford's actionable deceptive conduct consistent

45

Our analysis of plaintiffs' scheme liability claims is guided by a number of Supreme Court decisions. In 1971, the Court found a private right of action to be implicit in § 10(b) and

---

with *Stoneridge*."). Accordingly, we will not reach this issue.

Plaintiffs also contend the *Affiliated Ute* presumption of reliance—a presumption that can be invoked when a duty to disclose material information has been breached, *see* 406 U.S. at 153-54—applies because Clifford Chance had a duty to disclose the material weaknesses under the Model Rules of Professional Conduct (MRPC). In their motion for class certification, plaintiffs argued they were entitled to a presumption of reliance under *Affiliated Ute* because Clifford Chance withheld material information regarding the 10-Q from DVI's investors. *See* 406 U.S. at 153-54. The District Court rejected this argument, explaining that the firm did not have a duty to disclose this information to investors. On appeal, plaintiffs now argue the law firm had a duty to disclose under the MRPC, which would trigger the *Affiliated Ute* presumption. For the same reasons we decline to consider plaintiffs' misrepresentation claim, we will not address their MRPC argument. Indeed, unlike their misrepresentation claim, which plaintiffs contend they alluded to throughout the District Court proceedings, the MRPC claim is nowhere to be found in the record.

46

Rule 10b-5. *See Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971). It has subsequently clarified the scope of this implied right and the contours of the elements necessary to establish a prima facie case. *See, e.g.*, *Basic*, 485 U.S. at 231-32 (defining the element of materiality in a § 10(b) action); *Chiarella v. United States*, 445 U.S. 222 (1980) (requiring a fiduciary relationship between a person and a company to hold that person liable for failing to disclose material non-public information before trading on it); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) (requiring scienter to succeed in a private action under § 10(b)); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977) (refusing to extend § 10(b) to cover "transactions which constitute no more than internal corporate mismanagement"); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) (confining a private Rule 10b-5 action to actual purchasers or sellers).

More than twenty years after *Superintendent*, the Court resolved uncertainty regarding from whom plaintiff-investors can recover in securities fraud actions, restricting the scope of private actions under the statute. It held that "a private plaintiff may not maintain an aiding and abetting suit under § 10(b)." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994). But the Court tempered the scope of its decision, explaining the holding "does not mean that secondary actors in the securities markets are always free from liability under the securities Acts." *Id.*

Any person or entity, including a lawyer,

accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met.

*Id.*

Two issues have arisen in private litigation following *Central Bank.*[31] First, there is uncertainty among the circuits as to how to differentiate primary and secondary liability. *Compare Pac. Inv. Mgmt. Co. v. Mayer Brown LLP* (*Refco*), 603 F.3d 144, 148 (2d Cir. 2010) ("[A] secondary actor can be held liable . . . only for false statements attributed to the secondary-actor defendant at the time of dissemination."), *and Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1205 (11th Cir. 2001) ("[I]n order for the defendant to be primarily liable under § 10(b) and Rule 10b-5, the alleged misstatement or omission upon which a plaintiff relied must have been publicly attributable to the

---

[31]After *Central Bank*, Congress amended the Exchange Act to permit the SEC to bring enforcement actions against any person that "knowingly provides substantial assistance to another person in violation of [the Act]," PSLRA, Pub. L. No. 104-67, § 104, 109 Stat. 737, 757 (codified in 15 U.S.C. § 78t(e)), but did not reverse the Court's holding with respect to private actions.

defendant at the time that the plaintiff's investment decision was made."), *with Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 n.5 (9th Cir. 2000) ("[S]ubstantial participation or intricate involvement in the preparation of fraudulent statements is [a] ground[] for primary liability even though that participation might not lead to the actor's actual making of the statements.").

Second, during the past fifteen years, many plaintiffs have also advanced "scheme liability" claims under Rule 10b-5(a) and (c) to reach secondary actors, who may have been integrally involved in furthering the fraudulent scheme, but who made no public statements. The essence of these claims is that even though secondary actors may not themselves have made actionable misrepresentations, they are nevertheless liable for primary violations of § 10(b) through their deceptive acts. This was the issue in *Stoneridge*, where plaintiffs, purchasers of common stock in Charter Communications, Inc., alleged that Scientific-Atlanta and Motorola, vendors of Charter, knowingly entered into sham transactions with Charter that allowed the company to book fictitious revenues. 552 U.S. at 154-55. Liability was premised on Rule 10b-5(a) and (c), as defendants were not alleged to have made any public misrepresentations. The Eighth Circuit affirmed the district court's dismissal of the plaintiff's claims, reasoning that defendants "did not issue any misstatement relied upon by the investing public, nor were they under a duty . . . to disclose information . . . . None of the alleged financial misrepresentations by Charter was made by or even with the approval of the Vendors." *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 443 F.3d 987, 992 (8th

49

Cir. 2006).

The Supreme Court affirmed, but rejected a narrow definition of "deceptive acts," making clear that "[c]onduct itself can be deceptive." *Stoneridge*, 552 U.S. at 158. The Court explained that even if defendants had made a deceptive act, it was not actionable because it lacked "the requisite proximate relation to the investors' harm." *Id.* at 158-59. Accordingly, the Court extended the reliance requirement, which was already established as an element of Rule 10b-5(b) misrepresentation cases, to actions based on deceptive conduct. Because "reliance is tied to causation," the question was "whether respondents' acts were immediate or remote to the injury." *Id.* at 160. The Court concluded the reliance requirement could not be met:

> In all events we conclude respondents' deceptive acts, which were not disclosed to the investing public, are too remote to satisfy the requirement of reliance. It was Charter, not respondents, that misled its auditor and filed fraudulent financial statements; nothing respondents did made it necessary or inevitable for Charter to record the transactions as it did.

*Id.* at 161. It connected its decision back to *Central Bank*, noting plaintiffs' view of primary liability "would revive in substance the implied cause of action against all aiders and abettors except those who committed no deceptive act in the process of facilitating the fraud," a view rejected in *Central Bank* and not revived in the PSLRA. *Id.* at 162-63.

50

Plaintiffs make two arguments with respect to their scheme liability claims. First, they argue the District Court erroneously interpreted *Stoneridge* to bar all scheme liability claims where the deceptive conduct was not publicly disclosed. They read *Stoneridge* to have created a "remoteness test" that requires district courts to assess (1) the level of the secondary actor's involvement in the scheme, *see id.* at 161; (2) whether the misrepresentation was the "necessary or inevitable" result of the defendant's deceptive conduct, *see id.* at 160; and (3) whether a defendant's conduct was in the "investment sphere," as opposed to conduct that was in the market for goods and services, *see id.* at 166. The third factor derives from language in *Stoneridge*'s conclusion: "Unconventional as the arrangement was, it took place in the marketplace for goods and services, not in the investment sphere. Charter was free to do as it chose in preparing its books, conferring with its auditor, and preparing and then issuing its financial statements." *Id.* Plaintiffs argue Clifford Chance is liable because its actions were relatively more active and substantial compared to the actions of the defendants in *Stoneridge*; its conduct inevitably caused DVI to issue the misleading 10-Q; and it acted within the "investment sphere."

The Second Circuit recently addressed this argument in *Refco*, a case with facts analogous to those presented here. The litigation arose from the demise of Refco, a large "provider[ ] of brokerage and clearing services in the international derivatives, currency, and futures markets." *Refco*, 603 F.3d at 149. Mayer Brown, Refco's primary outside counsel, and Joseph Collins, a

51

partner at the firm and the main contact to the company, allegedly participated in drafting and disseminating Refco's public filings, which specifically identified Mayer Brown as counsel to Refco. The court rejected plaintiffs' scheme liability claims under Rule 10b-5(a) and (c) based primarily on *Stoneridge*. "As was the case in *Stoneridge* . . . nothing the Mayer Brown Defendants did made it necessary or inevitable for Refco to record the transactions as it did." *Id.* at 160 (internal quotation marks and brackets omitted). The court also explained that whether defendants' conduct occurs in the "investment sphere" is not "materially relevant" because *Stoneridge* "was primarily focused on whether investors were aware of, and relied on, the defendants' own conduct." *Id.*

We too read *Stoneridge* to preclude plaintiffs' invocation of the fraud-on-the-market presumption of reliance. The Court's statement that defendants' conduct was "too remote to satisfy the requirement of reliance," *Stoneridge*, 552 U.S. at 161, did not create a remoteness test for private causes of action.[32] The

---

[32]In support of their remoteness test argument, plaintiffs rely only on cases where defendants were corporate insiders as opposed to secondary actors such as outside counsel. *See Pugh v. Tribune Co.*, 521 F.3d 686, 696-97 (7th Cir. 2008) (holding that *Stoneridge* precluded primary liability for an insider at Tribune); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 170 (S.D.N.Y. 2008) (holding that *Stoneridge* did not preclude § 10(b) liability for a Senior Vice President at Bristol Myers). These cases are relevant, but not directly on

52

fact that the vendors' conduct was "not disclosed to the investing public," *id.*, is what made it too remote to invoke a presumption of reliance. As noted by the District Court, Clifford Chance's degree of involvement in the alleged fraud was not materially different from the vendors' involvement in *Stoneridge*. Although Clifford Chance was allegedly more involved in the preparation of financial statements than the vendors (according to plaintiffs, the firm created the workaround so that DVI would not have to disclose the material weaknesses), the vendors' actions were relatively more active and substantial because they actually "created false documents that [they] submitted to Charter to further its fraudulent scheme." Order on Lead Pls.' Mot. for Partial Recons. at 5–6 (Aug. 27, 2008). Thus, we cannot materially distinguish the facts in this case from those in *Stoneridge*.

Moreover, no alleged act by Clifford Chance made it necessary for DVI to file the misleading 10-Q. Even assuming Clifford Chance developed the workaround to avoid disclosure of DVI's material weaknesses, and DVI would have issued a truthful 10-Q if the law firm did not present this alternative, it was still DVI, not Clifford Chance, that filed it. *See Refco*, 603 F.3d at 160 (explaining that Refco, not Mayer Brown, filed the fraudulent financial statements). That Clifford Chance's alleged

point. The question presented here is a narrow one—whether a law firm can be held primarily liable for participating in a scheme to defraud even though its role in the scheme was not publicly disclosed.

conduct occurred in the investment sphere also has no bearing on this case. The Court's distinction between the "investment sphere" and the "whole marketplace" does not affect whether DVI was "free to do as it chose in preparing . . . and then issuing its financial statements." *Stoneridge*, 552 U.S. at 166.

Second, plaintiffs attempt to establish the fraud-on-the-market presumption of reliance is available to them under *Stoneridge* by arguing that Clifford Chance's deceptive conduct was actually publicly disclosed—a necessary prerequisite of the reliance presumption. *See id.* at 159 ("[U]nder the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public."). They distinguish a "communication" requirement from a more stringent "attribution" requirement, asserting that *Stoneridge* does not require defendants to be publicly identified in order to invoke the fraud-on-the-market presumption. Whereas in *Stoneridge* the investors did not know about the vendors' transactions and the false communications they made to Charter, plaintiffs argue that Clifford Chance's deceptive acts were made public when DVI's 10-Q was released to investors, which shows DVI investors necessarily relied on the firm's conduct.

Plaintiffs in *Refco* also made this argument in an attempt to distinguish *Stoneridge*. But just as the Second Circuit held that a secondary actor can be liable in a private action under Rule 10b-5(b) only for misstatements attributed to that actor, it also required attribution to invoke the fraud-on-the-market presumption in a scheme liability action under Rule 10b-5(a)

54

and (c). *See Refco*, 603 F.3d at 159. Although Mayer Brown allegedly drafted Refco's misleading disclosures, none of Refco's misrepresentations were attributed to Mayer Brown. Accordingly, the court held that plaintiffs could not show indirect reliance on the firm's conduct. *Id.* at 159.

We agree with the Second Circuit and hold that in order for a plaintiff to invoke the fraud-on-the-market presumption of reliance against a secondary actor in a scheme liability action under § 10(b), the plaintiff must show the deceptive conduct was publicly attributed to that secondary actor.[33] *See also Affco Invs. 2001 LLC v. Proskauer Rose L.L.P.*, 625 F.3d 185, 194 (5th Cir. 2010) (holding "explicit attribution is required to show reliance under section 10(b)"). It is insufficient to show only that the deceptive conduct was publicly disclosed through other statements or conduct; the public must be made aware of the defendant's acts.[34] Our decision is guided by *Stoneridge*, where "[t]he Supreme Court explicitly rejected the argument that

---

[33]Like the Second Circuit, our decision applies only to "parties who are not employed by the issuing firm whose securities are the subject of allegations of fraud." *Refco*, 603 F.3d at 148 n.1, 158 n.6.

[34]Without attribution, the market will not know, and therefore cannot rely on the deceptive conduct. Plaintiffs cannot use the fraud-on-the-market presumption of reliance, but they may still have the opportunity to prove actual reliance on a secondary actor's conduct.

'investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect.'" *Refco*, 603 F.3d at 159 (quoting *Stoneridge*, 552 U.S. at 160). Here, as in *Stoneridge*, plaintiffs claims fail because they cannot demonstrate they relied on Clifford Chance's own deceptive conduct. *See Stoneridge*, 552 U.S. at 153.

Our decision conforms with both *Central Bank* and Congress's response to the decision, which gave only the SEC authority to bring actions against individuals for aiding and abetting. *See* 15 U.S.C. § 78t(e). "If *Central Bank*'s carefully drawn circumscription of the private right of action is not to be hollowed . . . courts must be vigilant to ensure that secondary violations are not shoehorned into the category reserved for primary violations." *SEC v. Tambone*, 597 F.3d 436, 446 (1st Cir. 2010) (en banc). In *Stoneridge*, the Court rejected plaintiff's view of primary liability in part because "it would revive in substance the implied cause of action against all aiders and abettors except those who committed no deceptive act in the process of facilitating the fraud." 552 U.S. at 162-63. The Court did not limit its rejection of plaintiff's view only to deceptive acts that were not communicated to the public, lending further support to an attribution requirement.[35]

_____

[35]We recognize that an attribution requirement may allow some secondary actors to escape liability simply by engaging in all conduct behind closed doors. We also agree with the Second Circuit's acknowledgment that "it is somewhat unclear how the deceptive conduct of a secondary actor could be communicated

56

We hold that a plaintiff cannot invoke the fraud-on-the-market presumption of reliance in a private action under Rule 10b-5(a) and (c) unless the deceptive conduct has been publicly disclosed and attributed to the actor. Here, because plaintiffs do not contend Clifford Chance's alleged role in masterminding the fraudulent 10-Q was disclosed to the public, they cannot invoke the presumption. Accordingly, their claim against the law firm cannot be certified as a class action because individual issues of reliance predominate.

## IV.

to the public and yet remain 'deceptive.'" *Refco*, 603 F.3d at 159. But both Congress and the Supreme Court have spoken on this issue, and both have declined to create or recognize a private right of action for aiding and abetting. *See Stoneridge*, 552 U.S. at 163-64 (explaining the Court's reluctance to extend implied private causes of action). In *Central Bank*, the Court explained that because "Congress did not attach private aiding and abetting liability to any express causes of action in the securities Acts," it "likely would not have attached aiding and abetting liability to § 10(b) had it provided a private § 10(b) cause of action." 511 U.S. at 179. And, as noted by the Supreme Court, secondary actors who aid and abet primary securities violations can still be subject to criminal penalties and civil enforcement by the SEC. *See Stoneridge*, 552 U.S. at 166 (listing criminal and civil enforcement provisions in the Exchange Act).

57

For the foregoing reasons, we will affirm the judgment of the District Court.