JORDAN, Circuit Judge,
concurring in the judgment part and dissenting in part.
I agree with the Majority’s conclusion, though not its reasoning, with respect to the question of antitrust impact, and I therefore join in holding that the District *209 Court did not abuse its discretion when it determined that Plaintiffs could establish antitrust impact through evidence common to a class comprising Comcast cable television customers in the Philadelphia DMA.[1] But because I conclude that damages cannot be proven using evidence common to that entire class, I would vacate the certification order to the extent it provides for a single class as to proof of damages, and I would remand the case to the District Court to consider whether the class can be divided into subclasses for the purpose of proving damages. I therefore respectfully dissent in part.[2]
As the Majority explains, Plaintiffs’ claims have three elements, (1) an antitrust violation, (2) antitrust impact, and (3) damages (see Op. at 190 (citing In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305, 311 (3d Cir.2008))).[3] In pursuing its motion to decertify the initial class, however, Comcast effectively conceded that there was predominance with respect to the element of an antitrust violation, stipulating that it was contesting only “the Rule 23(b) issues of predominance of the common issues of (1) antitrust impact and (2) methodology of damages.” (App. at 438.) When the District Court granted Com-cast’s motion,[4] it accepted that stipulation and instructed the parties that, moving forward, they “need only address these discrete issues.” (Id.) On appeal, after the District Court once more certified a class, Comcast has again limited its arguments to addressing predominance as to impact and damages. We are therefore faced with two related questions: First, whether the District Court abused its discretion by holding that, as required by Federal Rule of Civil Procedure 23(b)(3), common issues of law or fact predominate with respect to the question of antitrust impact, and, second, whether the District Court abused its discretion by likewise holding that common issues of law or fact predominate with respect to the question of damages.[5]
*210 The Majority opinion skillfully lays out the legal requirements for predominance and the standard under which we must review the District Court’s decision, and there is no need to repeat that legal background. I emphasize, however, the instruction from Hydrogen Peroxide that the question of predominance hinges on whether the elements of a class claim are “capable of proof at trial through evidence that is common to the class rather than individual to its members.” 552 F.3d at 311-12. With that requirement in mind, I address the contested elements in turn.
I. Whether Antitrust Impact Can Be Proven Using Evidence Common To The Class
In seeking class certification, Plaintiffs initially presented four theories of antitrust impact.[6] The District Court rejected three of them,[7] leaving Plaintiffs with only a single theory of antitrust impact: that Comcast’s clustering reduced overbuilding [8] and, therefore, increased prices. *211 Like the Majority, I see no abuse of discretion in the District Court’s holding that antitrust impact may be proven using evidence that clustering reduced overbuilding and so caused increased prices. Thus, I agree with my colleagues in the Majority that the element of antitrust impact is at least capable of proof on behalf of some class of consumers. The more complicated question, as I see it, is whether antitrust impact is capable of proof for a class encompassing all Comcast customers in the Philadelphia DMA, through the use of common evidence.[9] On that issue too I agree with the Majority’s holding that the District Court was within its discretion to conclude that the Philadelphia DMA is the appropriate geographic region within which antitrust impact can be proven with common evidence. I do not agree, however, with the Majority’s reasoning in support of that conclusion.
Much confusion has been caused in this case by the conflation of two distinct concepts: the antitrust concept of “relevant geographic market,” which has traditionally been defined as the smallest area within which a monopolist can exercise market power,[10] and the class action concept of a “class definition,” which gives the parameters of a set of plaintiffs as to whom the elements of a claim can be proven using common evidence.[11] Because, in this case, the class definition includes a geographic component, the term “relevant geographic market” has been used equivocally by the parties, the District Court, and the Majority to describe both the area affected by antitrust impact and the area within which potential class members reside — the latter area being what I will call, for lack of a better term, the “class region.”[12] The problem with that equivocal usage is that *212 the relevant geographic market and the class region are not necessarily coterminous. Even if we assume that, within the Philadelphia DMA, there are many distinct geographic markets that are relevant for antitrust purposes, as Comcast argues, that does not mean that Plaintiffs cannot prove, by common evidence, that Com-cast’s acts caused antitrust impact within all of them. As a theoretical matter, class proof can cover multiple relevant geographic markets, and, indeed, other Courts of Appeals have so held. See, e.g., In re Sugar Antitrust Litig., 559 F.2d 481, 483-84 (9th Cir.1977) (rejecting the argument that a class could not be certified “where the antitrust claims involve a variety of geographic and product markets”); Windham v. Am. Brands Inc., 539 F.2d 1016, 1018 (4th Cir.1976) (holding that a district court abused its discretion in refusing to certify an antitrust class that encompassed “11 different geographic markets”).
While the relevant geographic market and the class region are conceptually distinct,[13] the Majority, like the District Court, initially attempts to identify the class region in terms of the relevant geographic market. Unlike the District Court, however, the Majority decides that because “[djefining the relevant geographic market ... is an issue of the merits,” the question of the relevant geographic market is “not properly before us.” (Op. at 191-93.)
The Majority is correct that defining the relevant geographic market is not a task we need to undertake ¿t this stage, but that is not because the task takes us into the merits. It is rather because, regardless of whether there are one or many relevant geographic markets associated with the Philadelphia DMA, the question before us at this juncture is whether there is some class, in this case defined geographically, that can be shown, through common evidence, to have experienced elevated prices as a result of reduced overbuilding because of Comcast’s clustering. Should that region include only those franchise areas involved in the Cable System Transactions?[14] Should it include only those franchise areas in which RCN was licensed to overbuild, but did not? Should it encompass the Philadelphia DMA or some lesser or greater area? The Majority does not ask those questions, but, instead, after determining that Plaintiffs can attempt to prove that the relevant geographic market is the Philadelphia DMA, the Majority assumes that that also means that the class is properly defined to cover the Philadelphia DMA and, therefore, that Plaintiffs can prove by common evidence that clustering reduced overbuilding and increased prices throughout the DMA. (See, e.g., Op. at 206 n. 16 (dismissing Comcast’s argument that overbuilding should be analyzed at the franchise level because “Plaintiffs have established that the relevant geographic market can be the Philadelphia DMA”).) Fortunately, what the Majority assumes, namely that the Philadelphia DMA is the appropriate class region for proving antitrust impact, is supportable.
A compelling argument could be made that the class should consist only of those people living in franchise areas where RCN was licensed to overbuild, because *213 only those franchise areas that would otherwise have been overbuilt could have been affected by the elimination of that overbuilding.[15] Because RCN was licensed to overbuild only five of the eighteen Philadelphia DMA counties (see, e.g., App. at 3640 (Williams Dec.); App. at 4284-85 (Singer Reply Dec.)), that would suggest limiting the class region to those five counties.[16] Nonetheless, both Dr. Williams and Dr. Singer opined that, had RCN successfully overbuilt the five counties in which it was already licensed, it would have continued overbuilding into the remainder of the Philadelphia DMA. (App. at 4285 (Singer Reply Dec.) (“[H]ad RCN entered the five counties that it intended to ... it is likely that RCN would have expanded its footprint beyond those five counties into geographically contiguous areas throughout the Philadelphia DMA.”); App. at 4306 (Williams Reply Dec.) (“RCN likely would have continued to pursue its strategy of building into other areas in the Philadelphia DMA adjacent to its existing cable infrastructure, beyond the five counties.”).) The District Court relied on those statements in holding that Plaintiffs had shown that the anticompetitive effects of clustering could be proven throughout the Philadelphia DMA. Behrend v. Comcast Corp., 264 F.R.D. 150, 174-75 (E.D.Pa. 2010). Though one may be skeptical that RCN would have overbuilt even the five counties in which it was licensed, let alone the remainder of the Philadelphia DMA, it was not clearly erroneous for the District Court to' accept that the prospect of overbuilding throughout the DMA was capable of proof. Consequently, it was not an abuse of discretion for the District Court to hold that Plaintiffs could show, by common evidence, the antitrust impact of clustering throughout the Philadelphia DMA. Accordingly, while I do not agree with the Majority’s reasoning, I agree that the District Court was within its discretion in determining that an appropriate class region for proving antitrust impact is the Philadelphia DMA.[17]
*214 II. Whether Damages Can Be Proven Using Evidence Common To The Class
I part ways with the Majority entirely, however, when it comes to class-wide proof of damages. The only evidence supporting Plaintiffs’ claim that damages can be proven using evidence common to the class is the expert opinion of Dr. McClave. But, as detailed hereafter, Dr. McClave’s testi *215 mony is incapable of identifying any damages caused by reduced overbuilding in the Philadelphia DMA. Consequently, his testimony is irrelevant and should be inadmissible at trial, pursuant to Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 118 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as lacking fit. Thus, it cannot constitute common evidence of damages.[18]
*216 Our precedent explains that Rule 702 and Daubert impose three requirements for admission of expert testimony: the expert must be qualified, the expert’s methodology must be reliable, and the expert’s proffered testimony must fit the particular case. See United States v. Schiff, 602 F.3d 152, 172 (3d Cir.2010). Testimony fits when it “ ‘is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.’ ” Id. at 173 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir.1985)). Like any relevancy determination, the question of fit is reviewed for abuse of discretion. United States v. Ford, 481 F.3d 215, 217-18 (3d Cir.2007). Here, Dr. McClave’s opinion fails the requirement of “fit” because it is disconnected from Plaintiffs’ only viable theory of antitrust impact, i.e., reduced overbuilding, and, thus, the proffered expert testimony cannot help the jury determine whether reduced overbuilding caused damages.[19] It was, consequently, an abuse of discretion for the District Court to consider Dr. McClave’s opinion as demonstrating that damages could be proven using evidence common to the class.
As explained by the Majority, Dr. McClave arrived at his damages calculation by comparing actual cable prices in the Philadelphia DMA to prices in benchmark counties outside the Philadelphia DMA. By making those comparisons, Dr. McClave sought to identify the “but for” price of cable — that is the price that would have prevailed in the Philadelphia DMA but for the alleged anticompetitive conduct of Comcast. (App, at 3407 (McClave Dec.).) For that comparison to be relevant, however, Dr. McClave’s benchmark counties must reflect the conditions that would have prevailed in the Philadelphia DMA in the absence of any impact from that conduct. (Cf App. at 719 (McClave Cross) (stating that the goal of his benchmarking model was to identify “counties that reflect characteristics that one would find absent ... the effects of [Comcast’s alleged anticompetitive] conduct”).) And because the only surviving theory of antitrust impact is that clustering reduced overbuilding, for Dr. McClave’s comparison to be relevant , his benchmark counties must reflect the conditions that would have prevailed in the Philadelphia DMA but for the alleged reduction in overbuilding. In all respects unrelated to reduced overbuilding, the benchmark counties should reflect the actual conditions in the Philadelphia DMA, or else the model will identify “damages” that are not the result of reduced overbuilding, or, in other words, that “are not the certain result of the wrong.” Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931); see also, e.g., Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1353 (3d Cir.1975) (“ ‘The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong.’ ” (quoting Story Parchment, 282 U.S. at 562, 51 S.Ct. 248)); Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1494 (8th Cir.1992) (same); Broan Mfg. Co. v. Associated Distrib., Inc., 923 F.2d 1232, 1235 (6th Cir.1991) (same).
Dr. McClave’s benchmark counties fail in that regard because he formulated his model at a time when Plaintiffs had four separate theories of antitrust impact, and so he did not select his benchmark counties to isolate the impact of reduced overbuilding. He chose them, as one would expect, to reflect the impact of other conditions in addition to reduced overbuilding. Consequently, as described in greater de *217 tail below, once the District Court rejected Plaintiffs’ other theories of antitrust impact — leaving only the reduced-overbuilding theory- — Dr. McClave’s model no longer fits Plaintiffs’ sole theory of antitrust impact and, instead, produces damages calculations that “are.not the certain result of the wrong.” Story Parchment, 282 U.S. at 562, 51 S.Ct. 248.[20]
A. Dr. McClave’s Benchmark Counties Do Not Reflect “But For” Conditions in the Philadelphia DMA
To identify his benchmark counties, Dr. McClave used three “screens.” First, he screened for counties where Comcast’s market share was “less than 40%,” because that figure identified “markets where Comcast is likely to have less market power than it has acquired in the Philadelphia market.” (App. at 3410 (McClave - Dec.).) Second, he screened for counties where DBS penetration[21] was “at or above the national average” because “DBS ... penetration was allegedly constrained by the anticompetitive behavior of Comcast.” (Id.) Third, having identified counties in which Comcast’s share was less than 40 percent and DBS penetration was above the national average, Dr. McClave screened for overbuilding, identifying “each of the benchmark counties ... as either overbuilt or not overbuilt.” (App. at 3411-12 (McClave Dec.).) While those screens might, if properly employed, have helped identify relevant benchmark counties in a case involving antitrust impacts beyond limited overbuilding, they fail to identify the “but for” conditions that are relevant to what is now the only impact of Comcast’s allegedly anticompetitive conduct, namely the deterrence of overbuilding. They, therefore, cannot help identify damages caused by that impact. I examine the screens in reverse order.

1. The Overbuilt Counties Screen

While there are several problems in Dr. McClave’s opinion that reflect the lack of fit, nothing demonstrates it with more certainty than this: For thirteen of the eighteen counties in the Philadelphia DMA, Dr. McClave’s opinion does not even attempt to show that there were elevated prices resulting from reduced overbuilding. In fact, he assumes that there was no such effect.
As noted above, after identifying his benchmark counties using the market share and DBS penetration screens, Dr. McClave used a third screen to divide those counties into two groups, identifying “each of the benchmark counties ... as either overbuilt or not overbuilt.”[22] (App. *218 at 3411-12 (McClave Dec.).) Having done so, Dr. McClave estimated “but for” competitive prices, by comparing, on a county by county basis, prices in the eighteen actual Philadelphia DMA counties to prices in either the “overbuilt” or “not overbuilt” benchmark counties, and — crucially—he did so “assuming] that only the five counties that RCN indicated it planned to enter as an overbuilder would have been overbuilt.” (App. at 3412 (McClave Dec.).) At the outset, therefore, it is clear that Dr. McClave assumed that elevated prices resulting from reduced overbuilding would be present in only five of the eighteen Philadelphia counties. Dr. McClave then explained that, after making his calculations, “the overbuilt factor indicate[d] lower prices [in his model] in counties where the overbuilding factor [was] present.” (App. at 3422 (McClave Dec.) (emphasis added).) Thus, Dr. McClave’s model assumes that elevated prices from reduced overbuilding could be present only in the five counties “that RCN indicated it planned to enter,” and the model did, in fact, identify elevated prices from reduced overbuilding only in those counties. (App. at 3412, 22 (McClave Dec.).) For the remaining counties, while there may be some uncertainty as to what exactly caused any elevated prices, this much is certain: the elevated prices identified by Dr. McClave in those thirteen counties were, according to Dr. McClave himself, the result of something other than reduced overbuilding. Consequently, any “damages” identified by Dr. McClave with respect to those thirteen counties are “uncertain damages ... [that] are not the certain result of [reduced overbuilding],” and “may be substantially attributable to lawful competition.” Coleman Motor, 525 F.2d at 1353 (quoting Story Parchment, 282 U.S. at 562, 51 S.Ct. 248).
Because Plaintiffs have been limited by the District Court to an overbuilding theory of antitrust impact, any price elevation resulting from a source other than reduced overbuilding is simply irrelevant. Thus, not only have Plaintiffs failed to show that damages can be proven using evidence common to the class, they have failed to show, for thirteen counties in the Philadelphia DMA, that damages can be proven using any evidence whatsoever — common or otherwise. Perhaps, in those other counties, there is a way to show damages resulting from reduced overbuilding, but, if so, Plaintiffs have not identified it. As the burden lies with Plaintiffs to establish predominance, that alone should compel us to vacate the District Court’s certification order with respect to class-wide proof of damages.[23]

*219
2. The DBS Penetration Screen

Dr. McClave screened for counties where DBS penetration was at or above the national average because “DBS ... penetration was allegedly constrained by the anticompetitive behavior of Comcast.” (App. at 3410 (McClave Dec.).) Using that screen would have been appropriate if, as Plaintiffs originally argued and as Dr. McClave was originally informed, DBS penetration had been constrained by Com-cast’s anticompetitive conduct. But, as the District Court explicitly held, Plaintiffs failed to tie “Comcast’s clustering activity in the Philadelphia DMA to reduced DBS penetration.” Behrend, 264 F.R.D. at 165. Consequently, there is no evidence in the record suggesting that DBS penetration in the Philadelphia DMA was in any way affected by Comcast’s allegedly anticompetitive conduct. Rather, the District Court found that, while DBS penetration in Philadelphia was well below the national average, the cause of that reduced penetration — Comcast’s refusal to distribute Comcast SportsNet through DBS providers — “occurred prior to the class period,” is “unrelated to clustering,” is “based upon valid business considerations” and is “specifically permitted” by the FCC. Id.
Therefore, while DBS penetration in the Philadelphia DMA is below the national average, the cause of that reduced rate predated and is unrelated to Comcast’s clustering and, thus, even in the absence of Comcast’s allegedly anticompetitive conduct, DBS penetration in the Philadelphia DMA would be no different than the below average rate that has actually prevailed. As a result, any benchmark county used to identify “but for” conditions should use the actual DBS penetration rate from the Philadelphia DMA. Dr. McClave, nonetheless, used the much higher national average rate,[24] which identified benchmark counties in which cable prices were lower than in counties having DBS penetration similar to that in the Philadelphia DMA.[25] Because Dr. McClave then calculated damages by comparing prices in those benchmark counties (with national average DBS penetration and, therefore, lower prices) to actual prices in the Philadelphia counties (with below national average DBS penetration and, therefore, higher prices), at least a portion of Dr. McClave’s damages calculation results from the Philadelphia DMA having below national average DBS penetration. Since the cause of the below national average DBS penetration in the Philadelphia DMA is “unrelated to clustering,” is “based upon valid business considerations,” and is “specifically permitted” by the FCC, id., that reduced DBS penetration is the result of lawful competition, and, it follows, “[t]he damage figures advanced by [Dr. McClave] may be substam tially attributable to lawful competition.” Coleman Motor, 525 F.2d at 1353.
The Majority responds to this flaw only by stating that the DBS penetration screen was “included to estimate typical competitive market conditions, not to calculate liability for the foreclosure of DBS competitors.” (Op. at 205.) That explanation misses the mark. In identifying benchmark counties for use in a damages analysis, the goal is not to identify “typical competitive market conditions.” The goal is, and must be, to identify the conditions that would have existed “but for” Com-cast’s alleged anticompetitive conduct. In this case, even in the “but for” hypotheti *220 cal world, the Philadelphia DMA would not have been typically competitive. Rather, given the District Court’s findings, there is no question that, as a result of Comcast’s lawful competition, DBS penetration in the Philadelphia DMA would have been well below that present in a typical competitive market. Thus, by comparing Philadelphia to benchmark counties having the much higher national average DBS penetration, Dr. McClave’s model wrongly “calculate^] liability for the foreclosure of DBS competitors,” (id.) imposing damages based on the prices that would have prevailed had Comcast not lawfully foreclosed DBS competition.

3. The Market Share Screen

Dr. McClave screened for counties where Comcast’s market share was “less than 40%,” because that figure represented the midpoint between Comcast’s 20 percent share before the class period and its 60 percent share during the class period and so identified “markets where Comcast is likely to have less market power than it has acquired in the Philadelphia market.” (App. at 3410 (McClave Dec.).) Under Plaintiffs last viable theory of antitrust impact, however, while Comcast’s market share is relevant to the question of whether there has been any reduction in overbuilding, it is not relevant — at least not in isolation — to determining the damages caused by that reduction. Instead, the relevant market share is the share that would have been held by any incumbent in the “but for” hypothetical world.
As an illustration of that point, consider a hypothetical county with two equally sized franchise areas. Assume that, prior to the class period, Comcast had a 100 percent share of one franchise area and that AT & T had a 100 percent share of the other, so that each had a 50 percent share of the county as a whole. Assume further that, as part of its clustering efforts, Comcast acquired AT & T’s franchise area so that, today, Comcast has a 100 percent share of the entire county. To test the theory that clustering reduces overbuilding, a comparison between Com-cast’s current 100 percent share of the county and the 50 percent share that Com-cast would have had but for its clustering would surely be relevant in determining whether clustering effected any reduction in overbuilding.
Next, assume that, after making that comparison, Plaintiffs could show that, had no clustering taken place, RCN would have overbuilt 20 percent of each of the two franchise areas, so that, in the “but for” world, RCN would have a 20 percent share in each franchise area, and Comcast and AT & T would each have an 80 percent share in their respective franchise area. Pursuant to Plaintiffs’ only theory— that increased overbuilding decreases prices — any damages in that scenario arise solely from the difference between RCN’s 20 percent share in the “but for” franchise areas and RCN’s zero percent shares in the current franchise areas. The damages resulting from that foregone overbuilding are the same whether, in the “but for” world, the remaining 80 percent of the franchise in question would have been controlled by Comcast or by AT & T. It follows, therefore, that once the antitrust impact of Comcast’s clustering — i.e., the reduction in overbuilding — has been identified and accounted for as part of an overbuilding screen, any market share screen applied to isolate the “but for” conditions that would have prevailed in the Philadelphia DMA should screen not just for Com-cast’s share, but for the share of whatever incumbent would have been present but for the clustering.[26]
*221 Because Dr. McClave’s model already assumes that there has been a reduction in overbuilding and screens for it, the relevant market share for damages purposes is the share of the market maintained by any incumbent — regardless of the identity of the particular incumbent. By calculating the appropriate market share screen using only Comcast’s average share throughout the Philadelphia DMA, Dr. McClave has ignored any market share that, in the “but for” hypothetical world, would have been maintained by an incumbent other than Comcast. For franchise areas where Comcast was not present pri- or to the class period, Dr. McClave should have calculated damages by comparing Comcast’s current share to the “but for” share that would have been held by any incumbents Comcast replaced. Because he instead effectively calculated damages by comparing Comcast’s current share to Comcast’s zero percent share prior to the class period,[27] he unfairly suppressed the relevant incumbent share and artificially inflated the damages calculation.
Because none of Dr. McClave’s screens reflect the conditions that would have prevailed in the Philadelphia DMA “but for” any reduction in overbuilding, the damages Dr. McClave calculated are “not the certain result of the wrong,” Story Parchment, 282 U.S. at 562, 51 S.Ct. 248. Accordingly, Dr. McClave’s opinion cannot help a jury determine damages, and so would be inadmissible at trial for lacking fit. Because Dr. McClave’s opinion is the only evidence Plaintiffs have offered to meet their burden of showing that damages can be proven using evidence common to the class, I would vacate the District Court’s class certification with respect to class-wide proof of damages.[28]
*222 B. Damages Are Not Capable of Being Proven By Evidence Common to the Entire Class
While my thoughts thus far have focused on why Plaintiffs have not met their burden of showing that damages can be proven using evidence common to the class, none of the problems I have noted are necessarily irreparable. That is, Dr. McClave could conceivably redesign his model to address overbuilding throughout the Philadelphia DMA, to use actual DBS penetration rates, and to screen for the market share of all incumbents, not just Comcast. Nevertheless, there remains an intractable problem with any model purporting to calculate damages for all class members collectively.
Central to Dr. McClave’s damages model is the conclusion that the price of cable television service in any given franchise area is affected by the relative market shares of at least three entities: overbuilders, DBS providers, and incumbent cable providers. All else being equal, for example, areas that are overbuilt will have lower prices than areas that are not overbuilt, and areas with high DBS penetration will have lower prices than areas with low DBS penetration. For that reason, Dr. McClave’s model identifies benchmark counties by screening for the relative market shares of those three entities.[29] While I do not accept the manner in which Dr. McClave has measured the relative shares of those entities in the “but for” Philadelphia DMA, I accept the premise that the relative shares have significant influence on the price of cable television service.
If price does vary with the changes in relative share within a franchise area, however, it is hard to see how those 650 franchise areas[30] can simply be treated as average for purposes of proving damages. The record indicates that, on the contrary, the “but for” market shares of overbuilders, DBS providers, and incumbent providers would vary, sometimes significantly, from franchise area to franchise area.
Addressing overbuilding first, RCN— the only party licensed to overbuild any part of the Philadelphia DMA — was licensed to overbuild in only five counties. (App. at 3640 (Williams Dec.); App. at 4284-85 (Singer Reply Dec.).) While Plaintiffs’ experts have opined that, had RCN successfully overbuilt those five counties, it would have continued overbuilding elsewhere, (App. at 4284-85 (Singer Reply Dec.)), any overbuilding into the other parts of the Philadelphia DMA would, it seems clear, have come later than the overbuilding of the five licensed counties. Thus, while some franchise areas might have been overbuilt early in the class period, other franchise areas would *223 likely never have been overbuilt at all or have been overbuilt only later in the class period. There might, for instance, in the “but for” world be some franchise areas that were 50 percent overbuilt for the entire class period and other franchise areas that were only 5 percent overbuilt and only for a single year, or perhaps not overbuilt at all. That means that, both throughout the Philadelphia DMA and throughout the class period, there would probably be very significant variation in the “but for” level of overbuilding from franchise area to franchise area.
Consider next DBS penetration. Dr. McClave testified that the DBS penetration rate he used for the Philadelphia DMA was an average for the DMA, but he also said that it was his understanding that “DBS penetration varies across the cluster here” and that it was “possible that some of the counties in the Philadelphia DMA in fact have penetration that’s above the national median.” (App. at 729-30 (McClave Cross).) Thus, according to Dr. McClave, not only does DBS penetration vary across the Philadelphia DMA, but the variation is pronounced enough that some parts of the Philadelphia DMA have above national average DBS penetration despite the fact that the Philadelphia DMA, as a whole, has DBS penetration at only half the national average. Because DBS penetration was unaffected by Comcast’s alleged anti-competitive conduct, see supra Part 11(A)(2), DBS penetration in the “but for” Philadelphia DMA would likewise vary significantly from one franchise area to another.
Finally, with respect to the incumbents’ market share, the record gives little information regarding what the share of any non-Comcast incumbent would be in the “but for” world. We do know, though, that Comcast’s share prior to clustering varied markedly from franchise area to franchise area. (See, e.g., App. at 3833 (Chipty Dec.) (stating that Comcast “had a zero percent share of housing units in the majority of counties” and, therefore, that “Comcast’s share in the counties in which it was present was substantially higher than [its average market share]”); App. at 733 (McClave Cross) (testifying that, at the beginning of the class period, Comcast was present in “maybe half, maybe less of the counties” and that its share “in the counties where [it was] present” was probably higher than its average share)). And, where the other two components of market share — DBS penetration and overbuilding[31] — vary from one franchise area to another, it becomes a near mathematical certainty that the remaining portion of the franchise held by incumbent cable providers must likewise vary.[32]
The wide variation in the relative market shares evidenced by the record makes it hard to imagine a means of calculating class-wide damages. Even if Dr. McClave’s benchmarks were not problematic, to say that Comcast’s “but for” share of the market throughout the Philadelphia DMA would be, on average, 40% is about as meaningful as saying that “with one foot on fire and the other on ice, I am, on average, comfortable.”[33] Given that the three major factors identified as influ *224 encing price — overbuilding, DBS penetration, and incumbent share — vary widely within the franchise areas across the DMA, and given further that Comcast prices its cable service at the franchise level, (see App. at 716), I have difficulty accepting that it is appropriate to ignore those differences and take an average across the counties of the DMA.[34]
This primary flaw in Dr. McClave’s methodology — using a single set of assumptions for the entire Philadelphia DMA — cannot be fixed merely by altering his model. It seems to me that no model can calculate class-wide damages because any damages — such as they may be — are not distributed on anything like a similar basis throughout the DMA.[35] Rather, where some class members might reside in a franchise area that would have been 50 percent overbuilt for the entire class period and other class members might reside in a franchise area that would have been only 5 percent overbuilt and only for a single year, or not overbuilt at all, it strains credulity to believe that the damages suffered by those individuals would all be the same as a result of reduced overbuilding. Yet Dr. McClave’s model treats them as though they are the same,[36] *225 as would any model attempting to calculate damages on an average class-wide basis.
The variation in conditions within the nearly 650 franchise areas in the Philadelphia DMA means that the issue of damages is more fractured than a single class can accommodate. I do not suggest that there necessarily would need to be 650 subclasses. It may well be that subclasses could be created encompassing groups of multiple franchise areas having similar demographics. See, e.g., Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 566 (2d Cir.1968) (explaining that where “differences among the class members bear only on the computation of damages,” it “can be adequately handled ... [by] dividing] the class into appropriate subclasses”). Whether that would necessitate the creation of so many subclasses as to defeat the benefit of class treatment is something I do not venture to conclude on this record. But I would remand the case to the District Court for consideration of the feasibility of subclasses.
III. Conclusion
For the foregoing reasons, I would vacate the District Court’s certification order to the extent it provides for a single class as to proof of damages and remand the case for the District Court to address whether Dr. McClave’s model could, in fairness, be revised to accurately reflect the conditions that would have existed in the Philadelphia DMA in the absence of any reduction in overbuilding caused by clustering. I would further ask the District Court to consider whether the class certified for proving antitrust impact can be divided into appropriate subclasses for purposes of proving damages.

. I adopt the defined terms, such as "DMA,” as used in the Majority opinion.

. Although the Majority opinion decides the question of certification for a single class comprising Comcast customers in the Philadelphia DMA, it should be noted that its decision will become a template for resolving similar class certification questions pending in cases involving the Chicago and Boston media markets (see Op. at 187 & n. 5), and in all likelihood it will be cited in other lawsuits against cable television service providers (cf. App. at 3652 (Williams Dec.) (explaining that, as part of Comcast's swaps and acquisitions, "Adelphia received Comcast’s cable systems and subscribers located in Palm Beach, Florida and Los Angeles, California”)). Thus, the problems in the Majority's reasoning will have practical repercussions far beyond this case. I therefore write not only because I cannot join the Majority in permitting Plaintiffs to pursue damages on a class-wide basis, but also to provide a counterpoint to the Majority’s analysis for future consideration.

. Plaintiffs make separate claims for violation of both § 1 and § 2 of the Sherman Act, but each of those claims contains the three elements described above, with only the nature of the particular antitrust violation differing. Compare Hydrogen Peroxide, 552 F.3d at 311 (listing the elements of a § 1 claim as "(1) a violation of the antitrust laws — here, § 1 of the Sherman Act, (2) individual injury resulting from that violation, and (3) measurable damages”), with Am. Bearing Co. v. Litton Indus., 729 F.2d 943, 948 (3d Cir.1984) (listing the elements of a § 2 claim as “(1) an antitrust violation, in this case a violation of section 2 of the Sherman Act; (2) fact of damage or injury; and (3) measurable damages”).

. Because Comcast had moved to decertify the class entirely before stipulating to all issues other than the predominance questions described above, the District Court, which construed the motion to decertify as a motion for reconsideration, granted the motion only with respect to those predominance issues and denied it with respect to all other issues. (App. at 437.)

.While not expressed, the requirement that there must be predominance with respect to both antitrust impact and damages appears to be accepted by the parties and the Majority, and I likewise accept that predominance is issue specific. See, e.g., Hydrogen Peroxide, 552 F.3d 305 at 311 ("We examine the elements of plaintiffs’ claim through the prism of Rule 23,” to determine whether "proof of the essential elements of the cause of action requires individual treatment.” (internal quotation marks omitted)); Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir.2001) ("To determine whether the claims alleged by the putative class meet the requirements for class certification, we must first examine the underlying cause of action.... If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable.”) Of course, where only some elements of a claim require individual treatment, while others can be litigated collectively, it may be appropriate to certify a class for those elements that can be treated collectively, while certifying subclasses or requiring individual treatment for those that cannot. See, e.g., Fed.R.Civ.P. 23(b)(4), advisory committee’s notes (explaining that application of Rule 23(c)(4)’s provision allowing "that an action may be maintained as a class action as to particular issues only” may be appropriate where, for instance, liability can be proven class wide, but damages cannot); In re Nassau Cnty. Strip Search Cases, 461 F.3d 219, 231 (2d Cir.2006) (remanding to district court with instructions to certify a class for liability and to consider whether to also certify for damages or to, alternatively, certify subclasses for damages).

. Those theories were: (1) that Comcast's high market share resulting from clustering made it profitable for Comcast to deny Com-cast SportsNet to DBS providers, which lowered DBS penetration rates and allowed Comcast to raise prices; (2) that Comcast’s clustering reduced "benchmark competition” (the ability of customers to compare service and prices among competing providers), which allowed Comcast to raise prices; (3) that Comcast’s market power increased its bargaining power vis-a-vis content providers, which allowed it to raise prices for its services; and (4) that Comcast’s clustering deterred competition from overbuilders, allowing Comcast to raise prices.

. The District Court rejected the theory that clustering reduced DBS penetration because it found that Comcast's denial of Comcast SportsNet to DBS providers predated and was unrelated to clustering. It rejected the theory that clustering reduced benchmark competition because Plaintiffs had provided no evidence that television consumers actually engaged in benchmark competition. It rejected as "wholly unsupported” the theory that increased bargaining power vis-á-vis content providers increased prices.

. "Overbuilding,” as the Majority explained, is where a second cable provider — the "over-builder” — "builds and offers customers a competitive alternative where a telecommunications company already operates.” (Op. at 187.) The existing provider is often referred to as the "incumbent” provider.

. The geographic scope of the class is actually defined as Comcast’s Philadelphia cluster, which, as noted by the Majority, excludes the DMA counties of Lehigh and Northampton. As Dr. Chipty explains, those are the two counties in which Comcast has no presence (see App. at 3795 & n. 12 (Chipty Reply Dec.)), and, therefore, they would be excluded from the class regardless of its geographic scope. For ease of reference, I refer to the class as encompassing the Philadelphia DMA, rather than the Philadelphia Cluster, recognizing that those DMA counties in which there are no Comcast customers are not included in the class.

. For example, the Federal Trade Commission defines "relevant geographic market” as the region in which a hypothetical monopolist "would impose at least a [small but significant nontransitory price increase] on some customers in that region” without "this price increase [being] defeated by substitution away from the relevant product or by ... customers in the region travelling outside it to purchase the relevant product.” Federal Trade Commission, Horizontal Merger Guidelines 14-15 (2010). Cf. Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law § 5-30 (2010) ("[T]he relevant inquiry” for identifying a geographic market is "how far [customers] are willing to travel in order to avoid paying the defendant monopoly prices.").

. See In re DVI, Inc. Sec. Litig., 639 F.3d 623, 639 n. 22 (3d Cir.2011) (explaining that, pursuant to Rule 23(c)(1)(B), the class definition describes both "which individuals and entities are included” and the "claims, issues or defenses to be treated on a class basis”). While Rule 23(c)(1)(B) does not expressly state that the class should include only those for whom the defined claims can be proven by common evidence, it is apparent that any class must be defined in a manner consistent with all Rule 23 requirements, including commonality and predominance. Cf. id. at 639 & n. 22 (explaining that the question of whether there was predominance when it was alleged that some members of a proposed class "would be unable to demonstrate loss causation,” was an issue of "which individuals and entities are included in the putative class ... primarily relevant to class definition”).

. The class region will not necessarily be the same with respect to each element of a class’s claims. In fact, even in this case, the class region differs with respect to antitrust impact and damages because, for the reasons I identify infra Part 11(B), antitrust impact can be proven using common evidence across a wider region than damages can be.

. That is not to say that a class region and a relevant geographic market will always be different. An antitrust violation may often affect people in only a single geographic market, in which case the relevant geographic market and the class region would be in essence the same.

. The Cable System Transactions are, as described by the Majority, the transactions through which Comcast "clustered” its franchise areas by "contract[ing] with competing cable providers to either acquire them or to 'swap' cable systems it owned in areas outside the Philadelphia DMA for cable systems within the Philadelphia DMA.” (Op. at 185.)

.At least, Plaintiffs have provided no evidence that persons outside of franchise areas that would otherwise have been overbuilt can be affected by the elimination of that overbuilding. Dr. Williams opines that, where some parts of a franchise area are overbuilt, the overbuilding can affect prices in other parts of that same franchise area that are not overbuilt. (App. at 3704-14 (Williams Dec.) (explaining that where competing cable companies have "alternating franchise areas,” overbuilding by one company into portions of the competitor's adjacent franchise area can affect prices in the portion of the overbuilt franchise area "that remain monopolized”).) As a theoretical matter, it is also plausible that, when one franchise area has been overbuilt, the threat of further expansion by that overbuilder could put downward pressure on prices in nearby franchise areas. If such an effect is described in the multitude of expert opinions, however, the parties have not identified it. Moreover, even if there is such an effect, it would likely be attenuated by distance. It seems doubtful that overbuilding in, for instance, Bucks County, Pennsylvania would influence prices in Kent County, Delaware.

. Given that the Class’s whole theory is rooted in the premise that Comcast's clustering deterred overbuilding, it is no small matter that RCN — the only entity licensed to overbuild anywhere in the Philadelphia DMA- — ■ was licensed to overbuild in just five of the eighteen counties.

. The Majority responds to my efforts to identify the class region by stating that I have "misunderst[ood] an important distinction,” namely that Plaintiffs have identified a " 'class region' ... of a 'Philadelphia cluster’ which is distinct from the contested relevant geographic market of the " 'Philadelphia DMA.’ ” (Op. at 195 n. 8.) I do acknowledge that distinction. However, that does not speak to the point because, in spite of that distinction, there remains an equivocal use of the term "relevant geographic market.” That equivocation is evidenced by the Majority's statement — in response to Comcast's suggestion that franchise areas might be the appropriate class region for damages — that "Com- *214 cast is attempting to redefine the relevant market: inasmuch as Plaintiffs have established that the relevant geographic market can be the Philadelphia DMA ... their damages model passes muster.” (Op. at 206 n. 16.)
The Majority also asserts that there is no question about the class region because Com-cast does not dispute the class region but disputes only the relevant geographic market. (Op. at 195 n. 8.) That is not correct. While Comcast does not use the term "class region,” Comcast and its experts plainly argue that the scope of the class is too broad, and they dispute the District Court’s conclusion that antitrust impact can be proven by common evidence across the Philadelphia DMA. (See, e.g., App. at 3923 (Teece Reply Dec.)) ("[E]ven if RCN would have overbuilt all five counties entirely in the but-for world, this would not be sufficient to conclude that the impact of the challenged conduct would have affected all Comcast customers in the Philadelphia DMA.”); id. at 3922 ("I have seen no evidence that RCN ever intended to build out the entire Philadelphia DMA.”); Appellants Br. at 33 (arguing that Dr. Williams’s models do not show that clustering "deterred overbuilding ... in a manner affecting all class members”); id. at 24-25 (noting that RCN was licensed in only five counties and arguing that Plaintiffs cannot prove that RCN would have entered the Philadelphia DMA). While I do not agree with Comcast's effort to define the class region by reference to the relevant geographic market (any more than I agree with the Majority's conflating of those concepts), to say that Comcast does not dispute the contours of the class region is not accurate, as the foregoing citations indicate.
However, even if Comcast had not disputed the class region, it would still be appropriate for us to address it. The Majority faults me for, in its view, addressing problems not raised by Comcast, which the Majority asserts are, therefore, waived. (See, e.g., Op. at 202-03 n. 12) ("[T]he Concurrence-Dissent ... raises multiple arguments ... not addressed by Comcast's expert____ We must limit our review to the issues presented by Appellants and Appellees.”). But "there can be no waiver ... of the Judge's duty to apply the correct legal standard.... This is particularly true in the class action context, where ‘the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.’ ” In re Cmty. Bank of N. Virginia, 622 F.3d 275, 302 n. 20 (3d Cir.2010) (quoting United States v. Ali, 508 F.3d 136, 144 n. 9 (3d Cir.2007) and In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 785 (3d Cir.1995)). Thus, where Comcast has raised the issues of whether there is predominance with respect to antitrust impact and damages, we are required to "apply the correct legal standard,” — which is to determine whether those elements can, in fact, be proven using evidence common to the class — even if that requires us " ‘to conduct [our] own thorough [R]ule 23[b] inquiry.’ ” Id. (quoting Stirman v. Exxon Corp.; 280 F.3d 554, 563 n. 7 (5th Cir.2002)). By disregarding the problems I have endeavored to identify, the result is an overly broad class definition and, to the extent any legitimate claims are proven, a likely dilution of recovery. Our fiduciary responsibility to absent class members requires that we ensure compliance with the provisions of Rule 23, especially those " 'designed to protect absentees by blocking unwarranted or overbroad class definitions.' ” Id. at 291 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)); cf. Tri-M Group, LLC v. Sharp, 638 F.3d 406, 416 (3d Cir.2011) ("[T]he waiver principle is only a rule of practice and may be relaxed whenever the public interest or justice so warrants.”).
Moreover, we must be cognizant of "the pivotal status of class certification in large-scale litigation,” which is "often the defining moment in class actions (for it may sound the ‘death knell' of the litigation on the part of plaintiffs, or create unwarranted pressure to settle nonmeritorious claims on the part of defendants).” Hydrogen Peroxide, 552 F.3d at 310 (internal quotation marks omitted). Pointing out analytical, problems central to the certification question is no frolic and detour. It is our obligation.

. Although we have never explicitly held that expert testimony must satisfy Daubert at the class certification stage, it is implicit in both Supreme Court precedent and our precedent. In Wal-Mart Stores, Inc. v. Dukes, the Supreme Court recently expressed its "doubt” about a district court's conclusion that ‘Daubert did not apply to expert testimony at the certification stage of class-action proceedings.” -U.S. -, 131 S.Ct. 2541, 2553-54, 180 L.Ed.2d 374 (2011). In Hydrogen Peroxide, we explained that “opinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under Daubert or for any other reason.” 552 F.3d at 323. Inherent in that statement is the conclusion that a court could, at the class certification stage, exclude expert testimony under Daubert.
Even without the guidance of Dukes and Hydrogen Peroxide, simple logic indicates that a court may consider the admissibility of expert testimony at least when considering predominance. A court should be hard pressed to conclude that the elements of a claim are capable of proof through evidence common to a class if the only evidence proffered would not be admissible as proof of anything.
I recognize, of course, that in neither the District Court nor before us did Comcast describe its challenge to certification as a challenge to the admissibility of Dr. McClave's testimony. Nonetheless, while it did not use the language of Daubert, the substance of Comcast’s challenge was that Dr. McClave’s damages testimony was irrelevant and, therefore, did not fit the case. {See, e.g., Appellants' Br. at 37) ("Dr. McClave admitted that his damages model takes all of the anticompetitive effects of all of the complained-of conduct as a whole, and therefore cannot isolate damages attributable to specific conduct or effects.”); id. at 42 (“Dr. McClave’s DBS penetration screen is substantively invalid because it bears no relation to the competitive conditions that would have prevailed in the Philadelphia region.”); id. at 43 ("Dr. McClave’s 'market share' screen is likewise invalid because it bears no relation to the competitive conditions that would have prevailed in the Philadelphia region.”). The Majority protests my invocation of Daubert, but, regardless of whether we frame the issue as a question of fit under Daubert or simply ask whether the District Court abused its discretion by relying on irrelevant evidence, we are effectively asking the same question. I have chosen the terminology of Daubert because it is particularly apt for describing the difficulty created by the change in Plaintiffs' theory of impact and the consequent disconnect between that altered theory and Dr. McClave’s expert report. The short of it is, Dr. McClave’s model no longer fits the case. This observation is not, as the Majority fears, either an invitation or a demand for mini-trials in conjunction with class certification motions.
I note here as well my disagreement with the Majority’s claim that, at the class certification stage, we need only "evaluate expert models to determine whether the theory of proof is plausible.” (Op. at 204 n. 13.) The Majority supports that position by quoting Hydrogen Peroxides statement that " ‘if such impact is plausible in theory, it is also susceptible to proof at trial through available evidence common to the class.' ” {Id. (quoting Hydrogen Peroxide, 552 F.3d at 325).) That quotation is better understood, however, if one includes the first half of the quoted sentence, which states that “the question at class certification is whether, if such impact is plausible in theory, it is also susceptible to proof at trial through available evidence common to the class.” 552 F.3d at 325 (emphasis added). Thus, Hydrogen Peroxide does not suggest that we need only "evaluate expert models to determine whether the theory of proof is plausible,” as the Majority claims. To the contrary, Hydrogen Peroxide instructs that, even where a theory is plausible, “the question at class certification is whether” that plausible theory is susceptible to common proof. Id. If the only common proof offered is inadmissible expert testimony, then Plaintiffs have not met their burden of showing that the theory — plausible or not — is capable of common proof.

. I need not, and do not, question whether Dr. McClave is qualified as an expert or whether his methodology is reliable.

. Whether Dr. McClave’s opinion would have fit had the District Court allowed Plaintiffs to pursue all four of their theories of antitrust impact is irrelevant at this point.

. As noted by the Majority, "DBS” stands for “direct broadcast satellite” television service. (Op. at 195.) Dr. McClave actually used penetration rates for all alternative delivery systems ("ADS”), rather than just DBS systems. He opined, however, and the parties seem to agree, that "ADS is a proxy for DBS penetration rates.” (App. at 3410.)

. The Majority notes that the overbuilding screen is not mentioned by the parties or the District Court. (Op. at 207 n. 17.) While it is true that the parties do not use the terminology “overbuilding screen,” the District Court did indeed describe the concept to which I have given that label. See Behrend, 264 F.R.D. at 182 (“Once a county qualified as a benchmark for a particular year by satisfying [the DBS penetration and market share screens], it was examined to determine whether or not it had been significantly overbuilt.”). Whether one uses the "screen” terminology is not what is important. Dr. McClave, in fact, does not describe any of the benchmarking criteria as "screens,” which is a term that appears to have been only later applied to his methods.
Regardless of the terminology, the fact remains that Dr. McClave did screen for over *218 building in an attempt to account for elevated prices resulting from reduced overbuilding. Thus, that screen cannot be ignored in any "rigorous analysis,” Hydrogen Peroxide, 552 F.3d at 318, of whether damages resulting from reduced overbuilding can be proven by common evidence.

. The Majority states that, in criticizing Dr. McClave's model for identifying overbuilding damages in only five counties, I have "misse[d] the central theory of Plaintiffs' case: by deterring the entry of overbuilders through clustering, Comcast allegedly maintained higher prices across the entire market area.” (Op. at 206 n. 15.) This misperceives my reasoning. I understand Plaintiffs' theory but have pointed out that the theory, as altered by the District Court’s ruling, no longer matches Dr. McClave's opinion. More precisely, Plaintiffs’ claim is that by reducing overbuilding "Comcast allegedly maintained higher prices across the entire market area,” (id.) whereas Dr. McClave attempts to show that, by reducing overbuilding, Comcast maintained higher prices in only the "five counties that RCN indicated it planned to enter as an overbuilder,” (App. at 3412 (McClave Dec.)). The Majority notes that this particular problem with Dr. McClave’s damages theory was not identified by Comcast, but we ought note overlook significant problems with the class certification simply because they are ones we have identified rather than ones to which our attention has been directed.

. According to Dr. McClave, national average DBS penetration during the six year period for which he calculated damages averaged 24.17%, whereas actual DBS penetration in the Philadelphia DMA averaged 12.77%. (App. at 3411 (McClave Dec.).)

. The District Court discussed extensively the evidence that “DBS competition constrains cable prices.” Behrend, 264 F.R.D. at 163-65.

. Again, this is not to say that Comcast's market share, in particular, will never be relevant. As just discussed, it is highly relevant for determining antitrust impact. Moreover, *221 it might have been relevant to damages had the District Court not excluded three of Plaintiffs’ theories of antitrust impact. In fact, the market share screen appears to be another relic of the Plaintiffs' having initially presented four theories of impact. One of those theories was that Comcast's increased market share increased its bargaining power and allowed it to reduce prices, Behrend, 264 F.R.D. at 178-81, and a second was that Comcast's increased market share reduced the ability of consumers to engage in benchmark pricing by comparing Comcast’s prices to the prices of other cable providers in the region, id. at 175-78. Had either of those theories survived the class certification process, it might have made sense for Dr. McClave to screen for Comcast's market share, because, under those theories, Comcast’s market share directly impacted price. But the District Court rejected those theories, allowing Comcast to proceed only on a theory that clustering reduced overbuilding. Under that theory, what is relevant is the market share of all incumbent cable providers vis-a-vis overbuilders.

. I say he “effectively calculated damages” that way because Dr. McClave did not actually make a franchise by franchise comparison, which, as discussed infra Part 11(B), is itself problematic. He instead calculated Com-cast’s market share by averaging its share throughout the Philadelphia DMA. But, because he included in that average Comcast's zero percent share in the franchises in which it had not been present prior to the class period, instead of including the share held by the incumbent Comcast replaced, it is fair to say that he effectively calculated damages by comparing Comcast's actual share in those franchise areas to Comcast’s zero percent share prior to the class period.

. The Majority suggests that any problems with Dr. McClave's screens are “attacks on the merits of the methodology that have no place in the class certification inquiry,” because, "[e]ven if we were to overrule as clearly erroneous the District Court’s findings on all four contested pieces of Dr. McClave’s methodology' — i.e., modify both of Dr. McClave’s screens ... only the final amount of estimated damages would change.” (Op. at 207.) I disagree. First, the problems I ■have identified with Dr. McClave's screens call into question not only the amount of damages but also whether there are any means of proving damages at all in thirteen of the eighteen Philadelphia DMA counties. See supra Part 11(A)(1). Second, if Dr. McClave's model does not presently constitute a relevant means of calculating class-wide damages, to say that the model might be fixed, for exam- *222 pie by "modify[ing] both of Dr. McClave's screens,” (Op. at 207), is no better than saying that Plaintiffs have made "a threshold showing” of predominance or shown a sufficient "intention to try the case in a manner that satisfies the predominance requirement" — both of which are insufficient under Hydrogen Peroxide, 552 F.3d at 321 (internal quotation marks omitted). Plaintiffs have the burden of establishing predominance and, until they have actually proffered a model that shows how damages can be calculated on a class-wide basis, they have not met that burden — particularly when the only evidence they have offered should be entirely inadmissible. The Majority’s willingness to overlook the debilitating flaws in Dr. McClave’s model in an effort to avoid an "attack on the merits,” is precisely the kind talismanic invocation of "concern for merits-avoidance” that Hydrogen Peroxide forbids. Id. at 317 n. 17.

. Or, at least, he screens for overbuilders, DBS providers, and a single incumbent provider — Comcast. I have already identified, supra Part 11(A)(3), why he should instead screen for incumbent share.

. Dr. Besen, one of Comcast's experts, reports that there are 649 unique franchise areas in the Philadelphia DMA. (App. at 3782 (Besen Reply Dec.).)

. While there may be other "alternative delivery systems” that have a limited share of the market, Dr. McClave includes those providers in his DBS penetration screen, see supra note 21, and they are, therefore, accounted for.

. It is possible, of course, that the variation in DBS and overbuilder shares could be such that the combined total of the two is the same in different franchise areas, and, therefore, it is not a true mathematical certainty that incumbent share must also vary. That that would occur across the 650 franchise areas, however, seems implausible in the extreme.

.Sometimes attributed to Mark Twain, the actual source of this quote is unknown.

. The Majority asserts that "concern over using mathematical averages across the Philadelphia DMA ... is notably absent from Com-cast's briefing...." (Op. at 207 n. 18.) But it is not absent. In fact, Comcast criticizes Dr. McClave's screens by explaining that:
prior to the Transactions!)] Comcast did not operate in the majority of franchise areas in the DMA. By contrast, in the franchise areas where Comcast did operate, it is undisputed that Comcast's market share was significantly higher than 40%. Thus, the preclass "20%” market share Dr. McClave employed in the creation of his screen is a mirage, arrived at solely through the artifice of averaging Comcast’s greater-than-40% share of markets where it did operate with its "0% share" in hundreds of markets where it was not even present.
(Appellants Br. at 43.) That criticism precisely mirrors my own. Because of the significant variation in the market makeup from franchise area to franchise area, DMA-wide averages are not reliable. See also infra n. 35.

. This is not simply a case where there might be some variation in the amount of damages from one class member to another that can be ignored in order to gain the benefit of class treatment. Instead, due to the wide variations in the market makeup of the franchise areas across the DMA, proving damages will require some factual inquiry into the relative market shares of overbuilders, DBS providers, and incumbents in individual franchise areas (or perhaps, as subsequently noted in this dissent, groups of franchise areas). The Majority, quoting Wright's Federal Practice and Procedure, suggests that those differences in damages should not affect the certification process because " 'it uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action would be inappropriate.' ” (Op. at 204 (quoting Charles Alan Wright et al„ Federal Practice and Procedure § 1781 (3d ed.2005)).) I agree with the quoted statement, but would point also to the following quote from the same treatise: "Rather, the question of damages can be severed from that of liability and tried on an individual basis.” Id. Thus, neither Wright — nor any authority I can find — suggests that where there are wide differences in damages from one class member to another, those differences can be ignored. Wright suggests instead that those differences can be accounted for by considering liability on a class-wide basis but damages on a more individualized basis — consistent with what I propose.

.I recognize that Dr. McClave's model does not treat all franchise areas exactly the same, because he uses actual prices on a county-by-county level and, as a result, calculates a separate "but for” price for each county. (App. at 3424-26 (McClave Dec.).) But, while he uses actual prices on a county-by-county level, he calculates the "but for” prices using the same benchmark counties for the entire Philadelphia DMA (again, excepting Lehigh and Northampton, where Comcast has no presence). He treats the DMA as though the "but for” conditions would have been the same throughout.
*225 The Majority states that this criticism "overstates the degree of dissimilarity among the franchise areas” because I fail to note that "[mjany franchise areas within counties often have identical or nearly identical pricing.” (Op. at 207 n. 18) (quoting App. 3409 (McClave Dec.).) It may well be that there are similarities allowing for grouping of franchise areas, as I note in suggesting the possibility of subclasses. More fundamentally, however, the problem with Dr. McClave's opinion is not that it fails to account for variations in actual prices in the Philadelphia DMA, but that it fails to account for variations in the "but for” conditions that would have existed within the Philadelphia DMA. By so doing, the model is unable to distinguish between persons living in areas that may have been highly overbuilt and who, thus, would have suffered substantial damages, and persons living in areas that may never have been overbuilt and who, thus, would have suffered no damages.